USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1753 UNITED STATES OF AMERICA, Plaintiff, Appellant, v. ONE LOT OF U.S. CURRENCY ($36,634), Defendant, Appellee, _____ SALVATORE L. MELE, JR., Claimant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of the court in the above-captioned case, issued on January 8, 1997, is corrected as follows: On the cover page, change the dollar figure in the title to "36,634" On the cover page, just beneath the case caption, change "Lindsey" to "Lindsay" On page 8, line 3, insert "he" between "that" and "was" On page 14, line 1, replace "Degan" with "Degen" _____ _____ United States Court of Appeals United States Court of Appeals For the First Circuit ____________________ No. 96-1753 UNITED STATES OF AMERICA, Plaintiff, Appellant, v. ONE LOT OF U.S. CURRENCY ($36,634), Defendant, Appellee, ___ SALVATORE L. MELE, JR., Claimant. ____________________ APPEAL FROM UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Reginald C. Lindsay, U.S. District Judge] ___________________ ___________________ Before Cyr, Boudin, and Lynch, Circuit Judges. _______________ ____________________ Richard L. Hoffman, Assistant United States Attorney, with whom __________________ Donald Stern, United States Attorney, was on brief, for appellant. ____________ Terri Klug Cafazzo for claimant. __________________ ____________________ January 8, 1997 ___________________ LYNCH, Circuit Judge. The United States appeals LYNCH, Circuit Judge. _____________ from the entry of summary judgment against it in its action to forfeit one lot of currency totalling $36,634. The currency was seized from Salvatore Mele, Jr. at Logan Airport in Boston. The district court held that while there was adequate reason to believe that the money was connected to some unlawful activity, there was insufficient evidence that the unlawful activity involved drugs. Accordingly, the court held that the currency is not forfeitable under 21 U.S.C.  881(a)(6), which requires that the moneys be "in exchange for a controlled substance . . ., proceeds traceable to such exchange . . . [or moneys] used or intended to be used to facilitate [a] violation of [federal drug laws] . . . ." The court reasoned that the government had shown nothing more than that Mele met the profile of a drug courier, which was not enough. Attempting to defend his victory, Mele argues that certain of the district court's predicate rulings were too favorable to the government. Contrary to the district court's holdings, Mele says, he was detained at Logan in violation of his Fourth Amendment rights, and so the entire forfeiture fails. Alternatively, he denies the government has met its burden of establishing probable cause to support the forfeiture. -2- 2 We agree with the district court that there was no Fourth Amendment violation. On the forfeiture issue, the evidence, which went beyond mere profile evidence, established a sufficient nexus between the currency and illegal drug activity, and it provided probable cause for forfeiture. Accordingly, we vacate and direct entry of judgment for the government. I Agents of the U.S. Drug Enforcement Agency ("DEA") seized the money from Mele on November 1, 1994. Mele filed a motion under Fed. R. Crim. P. 41(e) seeking return of the money. On March 2, 1995, the United States filed a complaint for forfeiture in rem, supported by three affidavits which spelled out the government's version of the agents' airport encounter with Mele. The district court issued the forfeiture warrant and monition on March 23, and dismissed Mele's Rule 41(e) motion shortly thereafter. Mele then filed his claim of ownership, accompanied by an affidavit which asserted only that the money belonged to him, that he had kept it at his business, and that it had been seized illegally from him. The affidavit did not address any specific factual allegations about the airport encounter. Mele's answer to the government's complaint contained only general denials and admissions. -3- 3 The government filed a motion for summary judgment on August 14, supported by the three affidavits filed earlier and one additional affidavit. Mele responded with a submission captioned as a "Motion in Opposition to United States' Motion for Summary Judgment,"1 which contained neither a statement of disputed facts nor any accompanying affidavit. Six months later, on March 4, 1996, the parties argued the summary judgment motions. Mele's attorney attempted for the first time to contradict several of the government's asserted facts, and offered to have Mele testify on the spot as to his version of the facts. The district judge declined to permit either of these efforts because Mele had not properly put his version of the facts into evidence. He also denied counsel's oral motion for leave to supplement the record because Mele had had adequate time to submit evidence. The judge, consequently, decided the case solely on the basis of the facts in the government's affidavits and Mele's initial affidavit. Despite Mele's failure to offer any rebuttal evidence, however, the judge ordered summary judgment in his favor. Mele has not argued on appeal that the district court erred in denying his motion for leave to supplement the  ____________________ 1. Although Mele did not file a cross-motion for summary judgment, the district court treated the case as if he did. -4- 4 record. Such an argument would fail in any event. The decision whether to allow a motion for leave falls within the district court's discretion, Manzoli v. Commissioner, 904 _______ ____________ F.2d 101, 103 (1st Cir. 1990), and there was no abuse of discretion here. After losing on summary judgment, the government filed a motion to reconsider, which Mele opposed. Along with his opposition, Mele filed a new affidavit in which he contested many of the facts presented in the earlier government affidavits. The district court did not expressly rule on the admissibility of this new affidavit. In denying the government's motion, on the grounds that the government had failed to show probable cause to forfeit, the court made no reference to Mele's proffer. Given this and the court's earlier rulings, we believe the court did not allow the affidavit. Mele has not argued on appeal that the district court erred in refusing to consider his late-filed affidavit or that it was required to consider it.2 Such an argument too would fail. District court rulings pertaining to motions for reconsideration are reviewed for abuse of discretion, Gross v. Summa Four, Inc., 93 F.3d 987, 996 n.9 (1st Cir. _____ ________________ 1996), and there was no abuse here. Accordingly, on appeal,  ____________________ 2. Nor does he argue that the court did consider the ___ affidavit. -5- 5 we take the facts as presented to the court before the motion for reconsideration and the opposition were filed. II On November 1, 1994, DEA Transportation Task Force Agents Peter McCarron and Michael Cauley were stationed in Boston's Logan Airport. They were observing passengers checking in for a 10:20 p.m. "red-eye" flight to Los Angeles at the America West Airlines ticket counter. They observed a man, Salvatore Mele, Jr., pay for his ticket with $972 in cash, mostly twenty dollar bills. The man seemed nervous and "continuously scanned" the area. He was carrying only a nylon bag, which appeared to be mostly empty, and he did not check any luggage. After Mele purchased his ticket, the agents approached him and asked if they could speak with him. Mele agreed, trembling and with a look of panic on his face. Agent McCarron asked to see Mele's ticket. It was a round- trip ticket from Boston to Los Angeles, with a brief middle- of-the-night layover in Las Vegas on the outbound part of the trip. The return trip was for four days later, on a Saturday night red-eye flight, America West flight 68. Seeing the name "Sal Mele" on the ticket, McCarron recognized Mele as an associate of Anthony Bucci and Ralph Penta, two men known to McCarron as marijuana traffickers. Bucci and Penta had been arrested six weeks earlier, on a -6- 6 Sunday morning in September, at Logan Airport for possession of thirty pounds of marijuana with intent to distribute. Penta had flown in from Los Angeles on the same overnight America West flight 68 that Mele intended to take. Upon Penta's arrival at Logan Airport, he had delivered the marijuana to Bucci, who was waiting for him. At his booking, Bucci had said that he lived at 500 Salem Street, Medford, Massachusetts and that he was a business partner of Mele. Penta had told his parole officer that he was working in Mele's pizza shop. McCarron also recognized Mele as the man who had come that Sunday morning to bail Penta out after the arrest, paying $10,000 in cash. With this history in mind, McCarron began questioning Mele about his trip. Mele told McCarron that he was going to Las Vegas to visit his ex-wife and children. He appeared nervous and was sweating. McCarron asked him if he was carrying any narcotics or large sums of money. Mele responded that he was not, but stuttered in his response. McCarron repeated the question, and this time Mele said that he had "some money." When McCarron asked him how much, Mele answered "about $30,000." McCarron asked him why he was carrying so much money, and Mele replied that he planned to do some gambling in Las Vegas and look around for a pizza shop to buy there. McCarron had already seen Mele's ticket, -7- 7 which provided only a brief layover in Las Vegas en route to Los Angeles. McCarron then asked Mele if he would mind going with them to the DEA's airport field office to discuss the money further. Mele agreed, and they went to the field office. Agent Thomas G. Quin joined Mele and McCarron in the office shortly after their arrival. One of the agents asked Mele to show them the money. As Mele removed the money from a fanny pack he wore around his waist, McCarron noticed four valium tablets in the plastic wrapper of a cigarette package. Mele stated that he had been prescribed valium for his back. When asked why the valium was not in the prescription bottle, Mele said that he had brought just a few pills for his trip. Quin told Mele that he was going to seize the valium and summons Mele to court if Mele did not bring evidence the following day to prove that the valium was properly prescribed. The agents then counted the money and questioned Mele more about his plans. Mele reiterated his claim that he was going to Las Vegas to visit his ex-wife and children and to look for a pizza place. He would not provide the agents with his ex-wife's address or with any information about hotel reservations in Las Vegas. When asked the source of the money, Mele first said he had gotten the money from his -8- 8 pizza shop, where he kept it hidden, and then said it was from his savings and a court settlement. The agents asked Mele where he had been before his arrival at the airport. Mele stated that a friend, whom he refused to name, had driven him to a restaurant in Saugus, where he had dinner with his girlfriend. After dinner, he had his girlfriend drive him from the restaurant to an Osco drugstore on Salem Street in Medford and drop him off there. When asked why he had her drop him off at the Medford drugstore, Mele replied that he had to get "a few things," specifically, a few packs of gum. Mele was, however, unable to produce the gum. Mele stated that after leaving the drugstore, he flagged down a taxi and went to the airport. Quin knew that the drugstore in Medford was directly across the street from 500 Salem Avenue, the address Anthony Bucci had given when arrested six weeks earlier. At this point, Quin told Mele that his story was not believable. Quin stated that he thought the money was from drug proceeds and that Mele was going to Los Angeles to purchase more drugs. He informed Mele that the money was therefore being seized and he gave Mele a receipt. The next day Mele arrived at the DEA office with his attorney. He was unable to provide sufficient documentation to show that the valium was validly prescribed to him, as Quin had demanded. One of the agents noticed -9- 9 Bucci waiting outside in the car while Mele and his attorney were in the office. Later that day, the seized money was placed in a bag and, along with several other similar bags, was presented to a narcotics-detection dog. To use the jargon of the genre, the dog "alerted" to the bag containing the money. III Mele mounts two separate attacks. First, he contends that the government's entire case must fail because the initial seizure of the money, as well as much of the questioning, was tainted by a violation of his Fourth Amendment rights.3 Alternatively, he disputes the existence of probable cause at the forfeiture stage, which the government must show in order to forfeit the money.4 Review here is de novo for two reasons. The district court's grant of summary judgment is reviewed de  ____________________ 3. While evidence seized or gathered in violation of the Fourth Amendment may not be relied on to sustain a forfeiture, One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. _______________________ ____________ 693, 702 (1965), it is not the case that Mele's money itself _____ ______ is immune from forfeiture if it was unconstitutionally seized. See United States v. $7,850, 7 F.3d 1355, 1357 (8th ___ _____________ ______ Cir. 1993) ("The fact that the monies may have been illegally seized does not immunize them from forfeiture."). However, evidence obtained from the money -- such as the precise ____ amount Mele was carrying or the dog reaction -- could be suppressed if the seizure was unconstitutional. 4. Probable cause is a term with multiple offices. Here, there is no occasion to consider the standard of probable cause for arrest, because Mele's Fourth Amendment claim is ______ resolved on voluntariness grounds. Probable cause for forfeiture is considered later. __________ -10- 10 novo. Wood v. Clemons, 89 F.3d 922 (1st Cir. 1996). ____ _______ Additionally, the Supreme Court held last term that review by the courts of appeals of conclusions as to whether there had been a violation of the Fourth Amendment is de novo. Ornelas _______ v. United States, 116 S. Ct. 1657 (1996). _____________ A. Fourth Amendment Mele argues that his Fourth Amendment rights were violated because the agents brought him to the DEA airport field office from the ticket counter, transforming the initially consensual encounter into a stop. This stop, he says, lacked the reasonable and articulable suspicion necessary to justify it. See generally Terry v. Ohio, 392 ___ _________ _____ ____ U.S. 1 (1968); United States v. McCarthy, 77 F.3d 522 (1st _____________ ________ Cir. 1996), cert. denied, 65 U.S.L.W. 3368 (U.S. Nov. 18, ____________ 1996) (No. 95-9302). Further, he contends, the stop became a de facto arrest because of its duration and because of the nature of the place to which he was taken by the agents. The probable cause necessary to uphold an arrest, he argues, is similarly lacking. The government affidavits say that Mele went with the agents to the DEA field office voluntarily and that he was not told the money would be seized until some time after they had arrived at the office. Mele, on such evidence, plainly consented to going to the DEA office, and his Fourth -11- 11 Amendment arguments are baseless.5 There are no colorable Fourth Amendment concerns where an officer simply asks a few questions to a civilian, who voluntarily allows the encounter to continue. See, e.g., Florida v. Bostick, 501 U.S. 429, ___ ____ _______ _______ 434 (1991) ("The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature."); Florida v. _______ Rodriguez, 469 U.S. 1, 5-6 (1984); Florida v. Royer, 460 U.S. _________ _______ _____ 491, 497 (1983) (plurality opinion). Nor is an otherwise consensual encounter stripped of its consensual nature by the mere act of moving to a police office. See, e.g., United ___ ____ ______ States v. Mendenhall, 446 U.S. 544, 557-58 (1980) (plurality ______ __________ opinion); United States v. Jodoin, 672 F.2d 232, 234 (1st ______________ ______ Cir. 1982). The agents did not violate Mele's Fourth Amendment rights during their Logan Airport encounter with him. Mele's money was lawfully seized, and thus the forfeiture proceeding that followed was not tainted by unconstitutional conduct. The dispositive issue with respect to the government's  ____________________ 5. The voluntariness of Mele's verbal consent might be called into question if the agents had seized his money, or told him they intended to seize it, prior to his agreeing to accompany them to the DEA field office. Cf. United States v. ___ _____________ $83,900, 774 F. Supp. 1305, 1317 (D. Kan. 1991) ("The seizure _______ of the currency by [the officer] and [the officer's] expressed intention to keep the currency until its legality could be determined were objective reasons rendering the encounter nonconsensual from that point on. No reasonable person would voluntarily leave such a large sum of money with a law enforcement officer with the promise that it would be returned later if it all checked out."). This issue is not presented here. -12- 12 forfeiture case, then, is whether there was probable cause for forfeiture. B. Probable Cause for Forfeiture The district court correctly found that there was probable cause to believe that Mele was involved in some kind of illegal activity, but erred in finding that the government had failed to establish a sufficient nexus between his suspicious activity and the illegal drug trade, which the forfeiture statute, 21 U.S.C. 881, requires. In civil forfeiture cases brought by the government under 881, U.S. Customs procedures control the allocation of the parties' burdens of proof. 21 U.S.C. 881(d) (incorporating by reference U.S. Customs procedures). Those procedures employ a burden shifting mechanism. See 19 U.S.C. ___ 1615; United States v. $5,644,540, 799 F.2d 1357, 1362 (9th _____________ __________ Cir. 1986). Under this mechanism, the government must at the outset demonstrate that it has probable cause to institute the forfeiture proceeding. United States v. 255 Broadway, 9 _____________ ____________ F.3d 1000, 1003-04 (1st Cir. 1993). More specifically, the government must show that it has probable cause to believe "that the property had the requisite nexus to a specified illegal purpose." United States v. $68,000, 927 F.2d 30, 32 _____________ _______ (1st Cir. 1991).6 When the government seeks to forfeit  ____________________ 6. This circuit has most recently described the government's burden as being one of showing a "nexus." See $68,000, 927 ___ _______ F.2d at 32. Earlier cases used the term "substantial -13- 13 money, the nexus can be shown by demonstrating probable cause to believe either that the money represented the proceeds of a drug sale, see 255 Broadway, 9 F.3d at 1004, or that it was ___ ____________ intended to be used in the purchase of drugs, see $68,000, ___ _______ 927 F.2d at 32. The government need not trace the money to any particular drug transaction. 255 Broadway, 9 F.3d at ____________ 1004; United States v. Parcels of Land, 903 F.2d 36, 38 (1st _____________ _______________ Cir. 1990); United States v. $250,000, 808 F.2d 895, 899-900 _____________ ________ (1st Cir. 1987). Once the government has made the nexus showing, the burden then shifts to the claimant to show by a preponderance of the evidence that the property is not subject to forfeiture. 255 Broadway, 9 F.3d at 1004; ____________ $68,000, 927 F.2d at 32; $250,000, 808 F.2d at 897; cf. Degen _______ ________ ___ _____ v. United States, 116 S. Ct. 1777, 1781 (1996) ("The ______________ Government has shown probable cause to forfeit the property, and [claimant] must refute the showing or suffer its loss."). Burden shifting aside, probable cause for forfeiture may be measured by what the government knew at the time of the institution of the forfeiture proceedings, not  ____________________ connection." United States v. 28 Emery St., 914 F.2d 1, 3-4 _____________ _____________ (1st Cir. 1990) (citing cases). We need not resolve whether, as some cases suggest, "nexus" means something less than "substantial connection." Cf. United States v. West Side ___ ______________ _________ Building Corp., 58 F.3d 1181, 1188 n.13 (7th Cir. 1995) _______________ (comparing the two standards and endorsing "nexus" standard); United States v. Daccarett, 6 F.3d 37, 55-56 (2d Cir. 1993) _____________ _________ (same), cert. denied, 510 U.S. 1191 and 510 U.S. 1192 (1994). ____________ ___ The facts adduced here are more than adequate to establish a "substantial connection."  -14- 14 just what it knew at the time of the seizure. 255 Broadway, ____________ 9 F.3d at 1004; United States v. $191,910, 16 F.3d 1051, 1066 _____________ ________ (9th Cir. 1994); United States v. $12,390, 956 F.2d 801, 806 _____________ _______ n.5 (8th Cir. 1992). Probable cause for the purpose of 881 forfeiture means a "reasonable ground" for believing that the money is connected with illegal drug transactions. 255 Broadway, 9 _____________ F.3d at 1004; 28 Emery St., 914 F.3d at 3; $250,000, 808 F.2d ____________ ________ at 897. This standard requires more than "mere suspicion," but less than "prima facie proof." 255 Broadway, 9 F.3d at ____________ 1004; 28 Emery St., 914 F.3d at 3; $250,000, 808 F.2d at 897. ____________ ________ And "'[b]ecause there are so many variables in the probable cause equation, probable cause findings are not invariably bound by precedent.'" 255 Broadway, 9 F.3d at 1004 (quoting ____________ United States v. Maguire, 918 F.2d 254, 258 (1st Cir. 1990), ______________ _______ cert. denied, 499 U.S. 950 and 501 U.S. 1234 (1991)). ____________ ___ The evidence shows the government met its burden for establishing a nexus to drug activity: (1) Mele is associated with two persons known to the agents as accused drug traffickers, Bucci (Mele's business partner) and Penta (Mele's employee). Mele's nonsensically roundabout route to Logan Airport the night his money was seized -- from Saugus, via Medford, to East Boston -- indicated that he probably stopped at Bucci's house en -15- 15 route.7 Further, Bucci accompanied Mele and his attorney when they returned to the DEA field office the morning after the seizure. And Mele had bailed out Penta after Penta's earlier arrest for drug trafficking; (2) Mele was carrying $36,634 in cash; (3) He purchased a cash ticket on a "red-eye" flight to a "source city" and traveled with only a nearly empty carry-on bag; (4) He appeared to be very nervous as he bought his ticket, and became even more nervous when questioned by the agents, to whom he gave evasive, implausible, and false answers as to what he planned to do on his trip; (5) Mele's associate Penta had recently been apprehended at Logan Airport after arriving with drugs from the same city on the same flight on which Mele intended to return; and (6) A trained narcotics-detection dog "alerted" to Mele's money the day after the money was seized, indicating that the money had come into contact with illegal drugs. The government aptly likens probable cause to a wall, each of whose bricks represents a piece of evidence in the overall probable cause equation. Courts "'review each piece of evidence only to determine whether it is probative,  ____________________ 7. A traveler taking a normal route from Saugus to the airport, which is southeast of Saugus, would not pass through ____ Medford, which is southwest of Saugus. ____ -16- 16 not whether it establishes probable cause standing alone.'" 255 Broadway, 9 F.3d at 1004 (quoting United States v. _____________ _____________ $67,220, 957 F.2d 280, 285 (6th Cir. 1992)). Even where "no _______ particular circumstance is conclusive," it is "the 'aggregate' of the facts" that is examined. $250,000, 808 ________ F.2d at 899 (quoting United States v. $93,685.61, 730 F.2d ______________ __________ 571, 572 (9th Cir.), cert. denied, Willis v. United States, _____________ ______ _____________ 469 U.S. 831 (1984)). Mele attacks each brick alone, but fails effectively to attack the wall of probable cause. Taken as a whole, the facts here are more than adequate. We start with Mele's ties to Bucci and Penta. Association with known criminals, without more, is, of course, not enough to establish probable cause. See United ___ ______ States v. Coggins, 986 F.2d 651, 655 (3d Cir. 1993) ("Mere ______ _______ association with a known criminal cannot on its own be a basis for a 'reasonable suspicion.'" (citing Ybarra v. ______ Illinois, 444 U.S. 85, 91 (1979))); 2 LaFave, Search and ________ ___________ Seizure, 3.6(c), at 308 n. 100 (3d ed. 1996). But here _______ there are additional facts that deepen the probative value of Mele's association with the accused drug traffickers Bucci and Penta: Mele's strange route to the airport; Mele's and Penta's nearly identical itineraries; Bucci's appearance with Mele at the DEA office; and Mele's bailing out of Penta with a large sum of cash when banks were closed. This is more than "an incidental or fortuitous connection," United States _____________ -17- 17 v. 1933 Commonwealth Avenue, 913 F.2d 1, 3 (1st Cir. 1990), ________________________ to known drug trafficking activity. Mele was also carrying an extremely large sum of cash.8 See United States v. $37,780, 920 F.2d 159, 163 (2d ___ _____________ _______ Cir. 1990) ("Hernandez was carrying an extremely large sum of cash [$37,780] in small denominations, demonstrating that he was either inordinately carefree with his money or was involved in illegal activity."); United States v. $175,260, _____________ ________ 741 F. Supp 45, 47 (E.D.N.Y. 1990) (carrying $175,000 in airport contributes to probable cause for forfeiture because that is far more than the average person carries). Given the other facts here, it is not fatal to the government's case that Mele was not carrying drugs or drug paraphernalia at the time the money was seized from him. See United States v. ___ ______________ $215,300, 882 F.2d 417, 419 (9th Cir. 1989) ("Carrying a ________ large sum of cash is 'strong evidence' of [a connection to illegal drug activity] even without the presence of drugs or drug paraphernalia." (quoting United States v. $83,310.78, _____________ __________ 851 F.2d 1231, 1236 (9th Cir. 1988))), cert. denied, 497 U.S. ____________ 1005 (1990). Indeed, Mele's behavior at the airport only deepens the probable cause. See generally 2 LaFave, supra,  ___ _________ _____  ____________________ 8. Contrary to the government's argument, however, there is little significance in the fact that Mele's cash was "concealed," i.e., that it he carried it in a fanny pack. Few people carry money, especially large sums, in any way other than "concealed." -18- 18 3.6(e), at 327-33 (false, evasive, or misleading responses to officers' questions can contribute to probable cause). In particular, his claims that he intended to gamble in Las Vegas and look for a pizza shop to buy there made no sense in light of the fact that his ticket provided only a brief, middle-of-the-night layover in that Nevada city. As the Second Circuit has rightly observed, an "evasive, confused explanation for carrying such a large sum" serves only to "further arouse[] . . . suspicion[]." $37,780, 920 F.2d at _______ 163.9 Mele's obvious nervousness, evident both before the agents approached him and during the interview, although not  ____________________ 9. We do not, however, agree with the Second Circuit's suggestion that "[i]t may well be that through the byzantine world of forfeiture law, [C]ongress and the courts have implicitly created a rebuttable presumption that the possession of large amounts of cash is per se evidence of illegal activity." $37,780, 920 F.2d at 162. _______ As for Mele's cash purchase of the ticket, this has limited probative value. But see United States v. Sokolow, ___ ___ ______________ _______ 490 U.S. 1, 8-9 (1989) ("Most business travelers, we feel confident, purchase airline tickets by credit card or check so as to have a record for tax or business purposes, and few vacationers carry with them thousands of dollars in $20 bills."). The designation by the government of Los Angeles as a "known source city" for narcotics is also of little importance. See United States v. Glover, 957 F.2d 1004, 1017 ___ _____________ ______ (2d Cir. 1992) (Oakes, C.J., dissenting) ("As cases too numerous to cite have pointed out, 'source cities,' as testified to by law enforcement officers, include virtually every city in the United States of any size. . . . 'Source city' is essentially a meaningless term."). Like the factors discounted by the Supreme Court in Reid ____ v. Georgia, 448 U.S. 438 (1980), these two factors do not _______ meaningfully "relate[] to [Mele's] particular conduct," and they are also evident in "a very large category of presumably innocent travelers." Id at 441. __ -19- 19 alone of much probative value, see Jones v. DEA, 819 F. Supp. ___ _____ ___ 698, 702 (M.D. Tenn. 1993) (noting that air travelers are "often nervous about their trip and the dangers, real or imagined, which air travel poses to them"), does have some probative value when seen in combination with the rest of the story. See 2 LaFave, supra, 3.6(f), at 327-33 & n.160. ___ _____ Finally, the dog's reaction, indicating that Mele's money had at some point come into contact with narcotics, weighs some, but not a great deal, on the scale. See United ___ ______ States v. $30,060, 39 F.3d 1039, 1042 (9th Cir. 1994) ______ _______ (declining to find probable cause where government essentially based entire case on dog reaction). "Even though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's alert still retains some probative value. Ordinary experience suggests that currency used to purchase narcotics is more likely than other currency to have come into contact with drugs." United ______ States v. Saccoccia, 58 F.3d 754, 777 (1st Cir. 1995), cert. ______ _________ _____ denied, 116 S. Ct. 1322 (1996). ______ Thus, both Mele's conduct and the money itself provide probable cause for the government to obtain forfeiture of the money. The judgment of the district court is vacated and _______ the case is remanded with instructions to enter judgment for ________ the United States. -20- 20