**UNITED STATES of America,
Plaintiff,**

v.

**ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES, AND IMPROVEMENTS KNOWN AS 352 NORTHUP STREET, LOCATED IN THE CITY OF CRANSTON, RHODE ISLAND, Defendant.**

**C.A. No. 97–0718L.**

United States District Court,
D. Rhode Island.

March 19, 1999.

Michael P. Iannotti, AUSA, U.S. Attorney's Office, Providence, RI, for plaintiffs.

Thomas F. Connors, Providence, RI, for defendant.

*DECISION AND ORDER*

LAGUEUX, Chief Judge.

This case is before the Court for decision following a bench trial. Plaintiff United States of America ("United States") seeks the forfeiture pursuant to 21 U.S.C. § 881(a)(6) of defendant real estate located at 352 Northup Street in Cranston, Rhode Island (the "Property"). The United States alleges that the Property was purchased with the cash proceeds of illegal narcotics transactions conducted by Charles Kennedy, Jr. ("Kennedy Jr."), who is currently serving a fifteen year sentence for narcotics trafficking imposed by this Court. Challenging the forfeiture is claimant Bellevue Limousine Service, Inc. ("Bellevue"), a Rhode Island corporation controlled by Charles Kennedy, Sr. ("Kennedy Sr."), the father of Kennedy Jr. Kennedy Sr. counters that he purchased the Property on behalf of Bellevue with "clean" money unconnected to his son's drug dealing. For the reasons detailed below, the Court concludes that the Prop-

erty is subject to forfeiture to the United States but that claimant has an untainted interest therein.

## I. Standard of Law for Bench Trials

Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. *See* Fed. R.Civ.P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon." *Id.* It is within the purview of the trial court to weigh the credibility of witnesses for the purpose of making findings of fact. *See id.; United States v. One Lot of U.S. Currency ($36,634), 103 F.3d 1048, 1054–55 (1st Cir. 1997) (finding in a probable cause determination that a claimant's explanation was not believable).

## II. The Federal Law of Forfeiture

■ Federal statutes provide for the civil forfeiture to the United States government of property exchanged, or intended to be exchanged, for illegal narcotics. *See* 21 U.S.C. § 881(a). The subsection of this statute relevant to this proceeding provides that:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

. . . .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter . . . .

*Id.* § 881(a)(6). Real property may constitute proceeds and therefore be forfeited under § 881(a)(6). *See United States v. Parcels of Land,* 903 F.2d 36, 48 (1st Cir. 1990).

■ The forfeiture statute instructs that the burdens of proof in these actions are governed by 19 U.S.C. § 1615, the statute allowing for forfeiture of property for customs violations. *See* 21 U.S.C. § 881(d). The government bears the initial burden of demonstrating probable cause to believe the property at issue may be forfeited. *See* 19 U.S.C. § 1615; *$36,634,* 103 F.3d at 1052. The United States Court of Appeals for the First Circuit has explained that the government must establish "the existence of probable cause to believe that the property had the requisite nexus to a specified illegal purpose." *United States v. One Lot of U.S. Currency ($68,000),* 927 F.2d 30, 32 (1st Cir.1991). The government has satisfied this standard when it has shown that there is probable cause to believe that the property represented the proceeds of an illegal narcotics transaction. *See $36,634,* 103 F.3d at 1053. Significantly, although the government must establish a nexus between the property and some illegal narcotics transactions, it need not link the property to any particular transaction. *See United States v. Parcels of Property, With Building Appurtenances and Improvements Located at 255 Broadway, Hanover,* 9 F.3d 1000, 1004 (1st Cir.1993). Furthermore, " 'the government's evidence need not exclude other plausible hypotheses of the source of the money.' " *United States v. One Parcel of Real Property,* 921 F.2d 370, 377 (1st Cir.1990) (quoting *United States v. $250,000,* 808 F.2d 895, 899 (1st Cir.1987)).

■ Although each fact presented to the court in a probable cause proceeding must be weighed for probity, the final probable cause determination must be reached by considering the totality of the facts before the court, not by examining specific facts out of context. *See United States v. $250,000,* 808 F.2d 895, 899 (1st Cir.1987) (explaining that courts must view the " 'aggregate' of the facts"). In this Circuit, probable cause "requires more than 'mere suspicion,' but less than 'prima facie proof.' " *$36,634,* 103 F.3d at 1054

(quoting *255 Broadway,* 9 F.3d at 1004). In essence, the court's task is to search for a "reasonable ground" for believing that the property is linked to illegal narcotics transactions. *Id.*

■ Every probable cause inquiry is unique because of the myriad of factual scenarios upon which forfeiture cases are based. Precedent in this area of the law, therefore, is less important than application of sound principles and common sense. *See 255 Broadway,* 9 F.3d at 1004 (" '[B]ecause there are so many variables in the probable cause equation, probable cause findings are not invariably bound by precedent.' ") (quoting *United States v. Maguire,* 918 F.2d 254, 258 (1st Cir.1990)); *One Parcel of Real Property,* 921 F.2d at 376 (applying "common sense," "reason," and "common experience considerations" to the probable cause inquiry). Furthermore, probable cause may be based on any reliable evidence, including circumstantial evidence, as well as evidence that would be inadmissible at trial. *See Parcels of Land,* 903 F.2d at 38.

■ If the government is successful in demonstrating probable cause, the burden of proof shifts to the claimant to prove by a preponderance of the evidence that the subject property should not be forfeited. *See United States v. Parcel of Land and Residence at 28 Emery Street, Merrimac, Mass.,* 914 F.2d 1, 3 (1st Cir.1990). The claimant must "establish that some or all of the property is not traceable as proceeds from an illegal exchange of controlled substances." *One Parcel of Real Property,* 921 F.2d at 375.

■ A claimant who fails to prove that the property is not the proceeds of illegal narcotics transactions may have recourse to a second defense. The forfeiture statute contains an "innocent owner defense" providing that "no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C. § 881(a)(6). Therefore, a claimant may be able to preserve an interest in the property if that claimant demonstrates both an ownership interest in the property and ignorance of the property's tainted past. *See United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 123, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993); *United States v. 170 Westfield Drive,* 34 F.Supp.2d 107, 114 (D.R.I.1999). Opportunities to successfully invoke this provision, however, are uncommon. *See United States v. Real Property Located at 20832 Big Rock Drive,* 51 F.3d 1402, 1410 (9th Cir.1995) ("The innocent owner exclusion from forfeiture comes into play only in those situations, admittedly rare, where a purchaser uses drug money to buy an asset, or an interest in an asset, without knowing the illegal source of the money. The clearest example of this would be a gift. . . .").

■ Even if the government is successful in establishing probable cause and the claimant fails to rebut that finding, the government may only be entitled to a portion of the property. "[A]n entire defendant property is not forfeitable on a mere showing that there is probable cause to believe that a portion of the property is traceable as proceeds from an exchange of controlled substances." *One Parcel of Real Property,* 921 F.2d at 375. Rather, the government is entitled only to that portion of the property which it can demonstrate was acquired with tainted funds. *See United States v. Pole No. 3172, Hopkinton,* 852 F.2d 636, 639–40 (1st Cir.1988); *170 Westfield Drive,* 34 F.Supp.2d at 116. It is the duty of the court to determine "the respective interests of the government and the claimant to the cash proceeds that result[ ] from the sale of the forfeited assets." *United States v. One 1980 Rolls Royce,* 905 F.2d 89, 92 (5th Cir.1990); *see One Parcel of Real Property,* 921 F.2d at 377.

### III. Findings of Fact

This Court has carefully reviewed the evidence presented by the parties during the three day bench trial and makes the following findings of fact based on those submissions.

At the heart of this forfeiture action is the tale of Kennedy Jr.'s criminal narcotics operation. In 1997, this Court sentenced Kennedy Jr. to fifteen years imprisonment on his convictions for conducting a continuing criminal enterprise, conspiracy to distribute controlled substances, and money laundering. These convictions were the result of federal law enforcement investigations that dated back to the 1980s. Uncovered by the investigators was a criminal organization, headed by Kennedy Jr., that included suppliers, brokers, and couriers who transported marijuana and cocaine from California, Mexico, and Florida to Kennedy Jr.'s East Greenwich, Rhode Island home. It is undisputed that the activities of this criminal ring were planned and directed by Kennedy Jr.

Kennedy Jr. and his cohorts employed several couriers to ferry cash and narcotics across the country, visiting cities such as Los Angeles and Miami, where wholesale drug purchases were made. Among those employed in such a capacity were Kenneth Mamoorian and Kennedy Jr.'s one-time girlfriend Laurie Ann Brodeur. Several associates also assisted Kennedy Jr. in acquiring illegal narcotics. One of these was Rodrigo Espinosa, who served as a broker in various drug transactions. In the early 1990s, Espinosa lived in Quebec City, Canada and served as one of Kennedy Jr.'s most important links to narcotics suppliers. Over several years, Espinosa was able to broker kilo-weight amounts of marijuana and cocaine for Kennedy Jr.

Against this backdrop of narcotics trafficking by Kennedy Jr., the government presents the action sub judice to forfeit real property located at 352 Northup Street, Cranston, Rhode Island owned by Bellevue. Bellevue, a limousine service, is owned by Kennedy Jr.'s father, mother, and brother. Kennedy Sr. is the principal of the corporation and controls sixty-percent of its equity shares. The United States contends that the Property was purchased by Kennedy Sr. with the proceeds of his son's illegal narcotics operations and, therefore, is forfeitable under 21 U.S.C. § 881(a)(6).

Kennedy Sr. purchased the Property on November 26, 1994 for $23,687.46 from Genevieve Park, an elderly woman who resided in the home and was planning to move into a long-term care facility. Kennedy Sr. paid the full purchase price that day in several sums. He placed a $1,000 deposit in cash on the Property early in the day. Later, at the closing, he paid Park $8,687.46. Of that amount, $8,000 was paid in the form of two bank checks for $4,000 each, both originally payable to Rodrigo Espinosa. The remaining $687.46 was paid in cash. The final portion of the sale price, $14,000, was paid outside of the closing on that same day, also in cash. Following the purchase, Kennedy Sr., with the help of several others, rehabilitated the Property over the course of six months, investing, by his estimate, $15,000 into the project in time and materials.

Because this Court, in determining whether the Property is linked to drug proceeds, must apply a totality of the circumstances test, the broader context of the relationship between Kennedy Sr. and his son is important as a reference point in evaluating their conduct at issue in this case. There is substantial evidence of a pattern of behavior between the father and son aimed at concealing the financial dealings of Kennedy Jr. Kennedy Sr. was, in effect, a financial broker for his son, taking large sums of cash from Kennedy Jr. and using those sums to purchase bank checks for his son's use. Kennedy Sr. also played the part of his son's front man, placing his own name on the records of sale for expensive items that his son was, in fact, purchasing for himself. The record includes several examples of such conduct.

In 1984, Kennedy Jr. purchased a home in East Greenwich, Rhode Island for $140,-000. According to several witnesses, the money used for the purchase was Kennedy Jr.'s and it was Kennedy Jr. who actually lived in the house. However, the deed was placed in the name of Kennedy Sr. The seller provided some financing for the house and $89,000 of the purchase price was paid at the closing in the form of nine bank checks issued from eight different banks. Using Kennedy Sr.'s name on the deed was part of a strategy devised by the Kennedys to conceal the origins of the funds used to purchase the property, according to Patricia Mandile, Kennedy Jr.'s former wife who was part of the scheme and who attended meetings where the strategy was discussed by the father and son. The family, including the father, his wife, the son, and his wife, decided that Kennedy Jr. would provide sums of cash in amounts of approximately $9,000 to the others who would purchase bank checks to be used at the closing. Their purpose in using sums of $9,000, according to Mandile, was to avoid the Treasury Department's Currency Transaction Report system which requires banks to inform the federal government of cash transactions involving at least $10,000. On the stand, Kennedy Sr. had no explanation for this unusual arrangement. He had to offer only a meek, and rather unbelievable, "I never asked why."

Kennedy Sr. allowed his son to use his name to conceal the true ownership of other expensive assets. In 1994, Kennedy Sr. signed a lease agreement and a credit application for a $75,000 Mercedes car with a local car dealer. However, Kennedy Sr. acknowledged at trial that the lease was negotiated by his son, that his son made the lease payments, and that the car was used by his son exclusively. When questioned why the two had structured the lease with Kennedy Sr. as the nominal lessee when both knew that Kennedy Sr. would have no other connection to the expensive vehicle, the father again re-

sponded with a canned "I never asked why."

In addition to evidence that Kennedy Sr. held as nominal owner a $29,000 Chevy truck actually purchased and used by his son and a second lot of real property in East Greenwich, valued at $90,000, actually purchased by his son, there is evidence that even smaller financial transactions were conducted by Kennedy Jr. through his father. During a search of Kennedy Jr.'s home, investigators found credit cards belonging to Kennedy Sr. Along with account statements, investigators discovered original transaction slips that indicate that Kennedy Jr. used the cards regularly. Among his purchases were charges for car rentals and hotel accommodations in California and Medellin, Columbia.

Furthermore, Kennedy Sr.'s pattern of facilitating his son's financial transactions included the conversion of large sums of Kennedy Jr.'s cash into bank checks. For example, in December 1994, according to bank records and the testimony of Kennedy Sr. himself, Kennedy Jr. gave his father $6,000 in cash. Kennedy Sr. deposited the money in his credit union account and immediately withdrew that same amount in the form of a bank check payable to Kenneth Mamoorian, a criminal associate of Kennedy Jr. and later a co-defendant in Kennedy Jr.'s criminal proceedings. Again, at trial Kennedy Sr. claimed that he never asked why his son made such requests of him. Similar conversions of Kennedy Jr.'s cash into bank checks were effected by the father for the purchase of the East Greenwich home and for the 1994 payments intended for criminal associate Rodrigo Espinosa mentioned above.

These transactions are significant not only because they establish a pattern of conduct by the Kennedys by which the son was able to conceal his investments, but because the cash he used in each of these transactions very likely represented the proceeds of his illegal narcotics trafficking. There is no credible evidence in the record that Kennedy Jr. was ever gainfully em-

ployed. According to his former wife, he didn't work. According to the Internal Revenue Service, he never filed a tax return. His father, who witnessed his son spend hundreds of thousands of dollars on real estate, cars, and travel, claimed to be unsure of how Kennedy Jr. earned this money. Kennedy Sr., again unbelievably, claimed at trial that he never asked his son very much about his business dealings and that he assumed his son was earning the money as a deep-sea fisherman, or maybe as a private investigator, or maybe as a part-time jewelry salesman, or maybe even as a locksmith.

In addition to acting as a broker for his son's cash transactions, Kennedy Sr. also served as a banker, holding several thousands of dollars in cash in his Warwick, Rhode Island home for his son "in case he [Kennedy Jr.] needed it." In May 1996, federal investigators executed a search warrant for Kennedy Sr.'s residence. They found hidden in the bathroom nearly $9,000 in cash that Kennedy Sr. identified as belonging to his son. The only explanation given by the father for the stash was that he was asked by his son "to hold onto it."

It is within the context of this money laundering relationship between father and son that the purchase of the Property must be viewed. Of the $23,687.46 purchase price, $15,687.46 (the $1,000 deposit plus the $14,687.46 paid at and outside of the closing) was paid in cash that Kennedy Sr. claimed to have had around the house. There is at least probable cause to believe that this money represented the proceeds of Kennedy Jr.'s illegal narcotics dealings. Despite Kennedy Sr.'s contention that he regularly hoarded up to $15,000 in cash in his home, no cash was found there when his house was searched in May 1996 except for the cash belonging to his son. Furthermore, according to his own financial records, $15,000 represented a large percentage of the income earned by him and his wife, nearly thirty-percent of the annual total. As discussed above, Kennedy Jr.

earned his cash from drug dealing; he had no other means of accumulating $15,000. Kennedy Sr.'s recital of the origins of the funds he used for the purchase is not credible, while the common sense inference that it was Kennedy Jr.'s money is compelling.

The power of this inference is strengthened by the presence of the two checks payable to Rodrigo Espinosa among the funds used by Kennedy Sr. to purchase the Property. Given the criminal relationship between Kennedy Jr. and Espinosa, the large sums involved, and Kennedy Sr.'s declared ignorance of Espinosa's identity, there is probable cause to believe that these two checks were purchased by Kennedy Sr. with proceeds of his son's narcotics trafficking. When combined with the Kennedys' methods of concealing the true nature of Kennedy Jr.'s financial transactions, these checks, payable to a known criminal associate of Kennedy Jr., color with probable cause the entire lot of money used for the purchase.

Kennedy Sr.'s tales of the origins of the two checks and the $15,687.46 in cash are not credible. On the stand, he trotted out yet again his familiar refrain, that he "never asked why" his son asked him to purchase two $4,000 checks payable to Espinosa. He also claimed that the checks were purchased with his own funds, however his credit union statements do not indicate significant withdrawals near the time that the checks were purchased. As to the cash, his explanation, as discussed above, is an unlikely story. Given the large amount of cash involved relative to the reported incomes of the Kennedys, the history of the Kennedys' money laundering, and the presence of the Espinosa checks, there is also probable cause to believe that the cash used in the transaction represented the proceeds of Kennedy Jr.'s illegal narcotics trafficking.

There is evidence, however, that Kennedy Sr. invested untainted resources into rehabilitating the Property. According to his undisputed testimony, Kennedy Sr. ex-

pended $15,000 and several months of time into repairs of the Property. This evidence was corroborated at trial by Thomas Beddingfield, Kennedy Sr.'s son-in-law and a participant in the repair of the Property.

## IV. Conclusions of Law

■ Based on the findings of fact discussed above, this Court concludes that the government has satisfied its burden of demonstrating probable cause to believe that the Property was purchased with illegal narcotics proceeds as required by 21 U.S.C. § 881(a)(6) and 19 U.S.C. § 1615. Applying a common sense approach to the question, this Court has no trouble finding that the combination of the Espinosa checks, the large sums of cash, the Kennedy Jr. convictions, and the pattern of asset concealment and money laundering between the father and son is sufficient to establish probable cause.

■ Furthermore, Kennedy Sr. has failed to carry his burden of proving either of the two defenses to forfeiture. He has not proven by a preponderance of the evidence that the funds used in the purchase were untainted. This Court finds his testimony regarding the origin of the Espinosa checks and the ownership of the cash used in the transaction not believable. It is more likely, based on the facts already recounted, that the cash, like the sum found by investigators in May 1996, was owned by Kennedy Jr. and that the checks represented Kennedy Jr.'s converted drug money.

■ Kennedy Sr. has also failed to prove by a preponderance of the evidence that he was an innocent owner of tainted property. Again, this Court finds not credible Kennedy Sr.'s testimony that he knew nothing of his son's drug dealing. Common sense compels this conclusion, and Kennedy Sr. cannot escape its consequences by feigning ignorance. Kennedy Jr. lived a lavish lifestyle, and his father was well aware of its extent given his role as his son's front man. It is not credible that Kennedy Sr. assumed that his son could afford multiple real estate holdings and expensive automobiles with no visible means of support. It is Kennedy Sr. who bears the burden of proving innocence and he has failed to produce any evidence, apart from his own unbelievable testimony, that would allow this Court to conclude that he knew nothing of his son's narcotics enterprise.

■ Therefore, this Court concludes that the entire $23,687.46 paid for the Property represents the proceeds of illegal narcotics trafficking. Claimant is entitled, however, to recoup, after the Property has been sold by the United States, Kennedy Sr.'s pro-rata share of the net sales price represented by the untainted $15,000 investment he made to improve the Property.

## V. Conclusion

For the forgoing reasons, this Court concludes that the United States has satisfied its burden of proof of probable cause under the forfeiture statutes and that claimant has sustained its burden that the funds used to rehabilitate the Property were untainted. The Property, therefore, is forfeited to the United States to the extent that its value represents the fruits of illegal narcotics trafficking. Consequently, the forfeiture sale proceeds, after subtracting the costs of forfeiture and sale, will be distributed as follows: 61% to the United States and 39% to claimant. Judgment shall be entered to that effect. It is so ordered.