UNITED STATES of America,
Plaintiff,

v.

**THE REAL PROPERTY WITH ANY IMPROVEMENTS THEREON LOCATED AT 40 CLARK ROAD, SANDISFIELD, MASSACHUSETTS, et al., Defendants.**

No. CIV A 97–30157–MAP.

United States District Court,
D. Massachusetts.

June 22, 1999.

Ariane D. Vuono, United States Attorney's Office, Kevin O'Regan, United States Attorney's Office, Springfield, MA, Patrick M. Hamilton, U.S. Attorney's Office, Shelbey D. Wright, United States Attorney's Office, Boston, MA, for U.S.

Robert A. Gordon, Springfield, MA, for Defendants.

*ORDER*

PONSOR, District Judge.

For the reasons stated in the accompanying Memorandum, plaintiff's Motion for Summary Judgment is hereby ALLOWED as to the Sandisfield Property; one 1994 Pontiac Transport vehicle; one 1986 Chevrolet pick-up; one 1993 Chevrolet pick-up; one 1989 Cadillac Allante vehicle; one John Deere tractor; one lot of $614,900; one lot of $15,820; one lot of $191,700 and one lot of sixteen gold bars. The Government has, at this point, failed to show that probable cause exists for forfeiture of the following remaining defendant properties: one 1980 Harley Davidson motorcycle; one 1990 Hover Craft; one 1975 Lincoln Continental; one Red Mac Roll Away Tool System; one diamond ring; one set of emerald earrings; and 76 pieces of art work. Additional briefs and supporting documentation with respect to these items will be submitted by July 9, 1999.

It is So Ordered.

### *MEMORANDUM REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

(Docket No. 19)

### I. *INTRODUCTION*

The United States of America ("the Government") has brought this action pursuant to 21 U.S.C. § 881(a)(4), (6) and (7) seeking civil forfeiture of both real and personal property (collectively "defendant properties") believed to have been derived from or used to facilitate a large-scale marijuana cultivation, processing and distribution operation in Sandisfield, Massachusetts. The defendant properties were seized pursuant to a successful investigation involving the collaborative efforts of the Drug Enforcement Administration ("DEA"), the Massachusetts State Police ("State Police") and the Western Massachusetts Narcotics Task Force ("Task Force"). The investigation also led to the recovery of marijuana valued in excess of

$8,000,000 and the prosecution of ten people on drug conspiracy and other charges.

The Government now seeks summary judgment with respect to the forfeiture of each of the defendant properties. This motion is opposed by Diana Ziegler, as Executrix of the Estate of Marcel Rosenzweig ("claimant"), who filed an Answer in this action as a party in interest.

For the reasons set forth in Sections IV, A through C, of this opinion the court will grant the Government's motion with respect to the following items: real property with improvements thereon at 40 Clark Road, Sandisfield, Massachusetts ("Sandisfield Property"); one 1994 Pontiac Transport vehicle; one 1986 Chevrolet pick-up truck; one 1993 Chevy pick-up truck;[1] one 1989 Cadillac Allante vehicle; one John Deere back hoe; one lot of $614,900 cash; one lot of $15,820 cash; one lot of $191,700 cash and one lot of sixteen gold bars. For the reasons set forth in Section IV, E, the court will request additional briefs and documentation from both the Government and claimant as to the following remaining items: one 1980 Harley Davidson motorcycle; one 1990 Hover Craft; one 1975 Lincoln Continental vehicle; one Red Mac roll away tool system; one diamond ring; one set of emerald earrings; and seventy-six pieces of art work.

## II. FACTUAL BACKGROUND

### A. *Undisputed Facts*

The Government, in Support of its Motion for Summary Judgment, relies upon the detailed affidavit of Special Agent Nor-

man J. Houle ("Agent Houle") of the DEA.[2] The affidavit is based on Agent Houle's own observations and reports, and those of other law enforcement personnel and investigators directly involved in investigating the illegal drug activity out of which this action arose.

In 1994, law enforcement agencies, including the DEA, State Police and Task Force began investigating the activities of Marcel Rosenzweig ("Rosenzweig") at the Sandisfield Property based on information obtained from various cooperating individuals and confirmed associates of Rosenzweig.[3] One of the sources had previously lived with Rosenzweig at the Sandisfield Property, and another obtained information from an individual, later identified as Rachel Gregg, who assisted Rosenzweig in his marijuana operation at the Sandisfield Property.

Law enforcement officials learned through the sources that Rosenzweig had been cultivating substantial amounts of marijuana at the Sandisfield Property for a number of years. They also learned that Rosenzweig traveled to New York twice a month with approximately ten to fifteen pounds of marijuana, which he sold for $50,000 to $70,000. According to the sources, Rosenzweig employed five to six people in the illegal operation and maintained equipment at the Sandisfield Property which he used to cultivate and process marijuana, including wooden drying racks, sifters, hydroponic lights and power generators. The sources also revealed that Rosenzweig had large amounts of cash and gold hidden at the property.

---

1. The 1993 pick-up was sold at auction for $16,000 which was deposited into an escrow account pursuant to this court's February 18, 1998 Order For Interlocutory Sale And Substitution Of *Res*.

2. Attached to Agent Houle's affidavit is an August 16, 1995 affidavit by him, an August 24, 1995 affidavit by DEA Agent Stephen W. Gawron, the deed and mortgage note to the Sandisfield Property, the various warrants to search that property and a Superseding Indictment against Rosenzweig and others.

3. The Sandisfield Property consists of a tract of land, a two-story residence and a separate three-story barn/garage. According to a recorded deed and related documents, it was owned by a New York corporation called Barene Real Estate, Inc. from 1977 until that corporation's dissolution in 1982. A 1977 mortgage on the property indicates that Rosenzweig, under his alias, Marcel Greenbaum, was president of that corporation.

In addition to information received from its sources, DEA agents subpoenaed telephone and electrical billing records relating to the Sandisfield Property from NYNEX and the Western Massachusetts Electric Company ("WMEC"). Accounts for these utilities were maintained under Rosenzweig's alias, Greenbaum. They learned that Rosenzweig maintained three numbers—one for an answering service, one for his private line and one for a credit card line. They also discovered, based on an interview with a WMEC representative, that the energy consumption at the Sandisfield Property from October of 1994 through April 25, 1995 was consistent with that of a commercial property and not that of a residence.

Based on the information obtained by the DEA from its sources and its preliminary investigation, DEA agents applied on August 16, 1995 for a warrant to search the Sandisfield Property. United States Magistrate Judge Kenneth Neiman issued a search warrant on that same day for the residence, garage/barn, out buildings and motor vehicles on site. The warrant was executed on August 17, 1995, at which time law enforcement officials uncovered a large-scale marijuana growing operation.

In the garage/barn, they discovered approximately five thousand marijuana plants growing, eighteen hundred plant cuttings and a hydroponic growing system equipped with grow lights, generators, reflectors, fans, timbers, pumps and tubing. The estimated value of the marijuana found in the garage/barn was in excess of $8,000,000. In the house, they found loose marijuana scattered about, a large trash can filled with marijuana, racks used for drying marijuana plants, a heat sealer, plastic bags, two scales and a roll of packaging material.

The officers and agents also discovered a pile of marijuana stalks and refuse in a cleared area of forest behind the garage/barn. They concluded that those materials were awaiting disposal by burial and that a John Deere tractor, which they located near the garage/barn, had been used to carry out this task in the past.

During August 17 search, law enforcement officials also discovered a suitcase containing $191,700 hidden behind a false removable wall in a bedroom closet and another suitcase containing $15,820. Both lots of cash, in addition to several of the other defendant · properties, were seized during the August 17 search. Moreover, Rosenzweig and another individual, Edward Brennan, were arrested.

Thereafter, DEA agents interviewed Rachel Gregg, who indicated that Rosenzweig hid additional cash and gold bars behind a refrigerator in the basement of the Sandisfield residence. Based on this new information, law enforcement officials applied for a second search warrant, which was issued by Magistrate Judge Neiman on August 24, 1995 and executed on that same day. During this search, $614,900 in cash and sixteen gold bars were discovered hidden behind the basement freezer and were seized.

Over the subsequent several months, nine additional people were arrested and charged on drug conspiracy or related offenses and other properties named as defendants in this action were seized. All of the vehicles recovered, except the 1994 Pontiac and 1993 Chevrolet pick-up were registered to Rosenzweig.[4] According to Rachel Gregg, Rosenzweig used both the 1989 Cadillac and the 1994 Pontiac in his bimonthly trips to New York to sell marijuana, and the 1993 pick-up to purchase fuel oil for the generator used to provide power to operate the growing equipment.

The continuing investigation by Government agents included interviews with several individuals who assisted Rosenzweig in the Sandisfield operation, which re-

---

**4.** Both the 1994 Pontiac and the 1993 pick-up were registered to Nicholas Pinto, who, among others, was later arrested, charged and convicted on drug conspiracy charges in connection with the Sandisfield operation.

vealed information regarding Rosenzweig's long history of illegal drug dealing. Rachel Gregg reported that Rosenzweig and Richard Haber, who, according to documents recovered from the Sandisfield Property, was one of Rosenzweig's trusted associates, had been involved in drug smuggling from South America and distribution of marijuana as far back as the 1970's. Agents learned from Cheryl Catranbone that Rosenzweig and Richard Haber had smuggled marijuana into the United States from Columbia on at least two occasions prior to 1982, approximately two tons in total, and, in turn, netted about $2,000,000 in profit from selling it. Catranbone also explained that the drugs were smuggled to the west coast via tuna boat and were then transported to the east coast in two vans and a motor home equipped with hidden compartments and disguised as a film production company.

Additionally, according to statements provided by seven individuals, including Rachel Greg, Cheryl Catranbone (who lived with Rosenzweig at the Sandisfield Property between 1982 and 1990), Rosenzweig, Richard Haber and others had cultivated marijuana in an underground growing facility on property owned by Herbert Derman in Egremont, Massachusetts. Catranbone stated that she was present when Rosenzweig approached Derman in the early 1980's about constructing the underground facility. According to her, Derman agreed to allow Rosenzweig to use his property in exchange for a portion of the proceeds of the illegal operation. Thereafter, the underground facility, along with an aboveground greenhouse to conceal it, was constructed and produced the first harvest in the Spring of 1984.

Catranbone noted that sophisticated growing techniques were employed at the Egremont site, which featured computers and hydroponic equipment similar to items found at the Sandisfield Property. She stated that Rosenzweig harvested from twenty to sixty pounds of marijuana a month between the Fall of 1984 until she left in 1990. She explained that it was harvested, transported to the Sandisfield Property in a Chevrolet pick-up, and dried, manicured, packaged and later sold in New York.

Others who worked for Rosenzweig in Sandisfield confirmed the information regarding his drug smuggling from South America and the underground facility on Derman's property. Additionally, Rosenzweig's sister, Cora Stewart and her husband, Gregory Stewart, stated that Rosenzweig had confided in them that he was growing marijuana in an underground space on Derman's property. Law enforcement agents, pursuant to a warrant issued by this court, searched Derman's property and located the underground growing space. A forensic chemist employed by the DEA confirmed that marijuana had been grown in the underground facility at some time in the past.

### B. *Disputed Facts*

The Government has submitted evidence that Rosenzweig had no known source of legitimate income, though he told people he was a film producer. The claimant has introduced excerpts of the transcript of Barbara Derman's testimony from the trial of her husband, Herbert Derman, regarding Rosenzweig's other potential sources of income. The excerpts on which the claimant relies, as quoted from her brief, are as follows:

1. Met Marcel Rosenzweig in 1994. P.19

2. Marcel Rosenzweig was in the film business. He told her that he did educational films. One of the films had to do with fire hazards. He was extremely knowledgeable about lenses and use of a darkroom. P. 20.

3. Marcel Rosenzweig had a large vehicle that is used in motion pictures. Saw him on the streets of New York. He had cameras, tripods, lighting fixtures, and reels. Marcel Rosenzweig was a partner in a Greenwich Village restaurant named Paris Bistro. P. 21.

4. Marcel Rosenzweig and the ex-wife of Pele, the soccer star invested in an art deco furniture company. P. 22.

5. Two corporations were formed. One was named RoseMarc and the other was Deco. The purpose was to buy furniture overseas. P. 23.

6. Marcel Rosenzweig bought racehorses and was very successful. P. 24.

7. Marcel Rosenzweig would bet on quite a lot of horses. P. 25.

8. Marcel Rosenzweig was involved in a business named La Piano that built custom pianos. P. 28–30.

Claimant's Memorandum of Law in Opposition to [Government's] Motion for Summary Judgment, pp. 10–11.

### III. *PROCEDURAL BACKGROUND*

On September 12, 1995, a grand jury sitting in the District of Massachusetts returned an indictment against Rosenzweig and Brennan, charging each with conspiracy to manufacture and distribute marijuana in violation of 21 U.S.C. § 846, manufacturing and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841, and criminal forfeiture pursuant to 21 U.S.C. § 853. The forfeiture count against Rosenzweig involved eighteen assets, including those named in the present civil forfeiture.

On December 28, 1995, Rosenzweig filed a motion to suppress on all evidence seized or obtained by the Government as a result of the August 17, 1995 search of the Sandisfield Property on the ground that the search violated the Fourth Amendment. Specifically, he asserted that the August 16, 1995 search warrant was invalid because the affidavit on which it was based was constitutionally insufficient. Rosenzweig also filed a motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) to determine whether the affidavit contained material omissions or false statements.

Both motions were referred to Magistrate Judge Neiman for a Report and Recommendation. On February 9, 1996, following the submission of briefs by both Rosenzweig and the Government, the Magistrate Judge issued a written Report an Recommendation, recommending that the motions be denied. Rosenzweig filed an objection to the Report and Recommendation and a supporting memorandum, to which the Government filed a reply. On March 18, 1996, following a *de novo* review, this court adopted the Magistrate Judge's Report and Recommendation and denied Rosenzweig's motion to suppress and motion for a *Franks* hearing.

On April 9, 1996, the grand jury returned a Superseding Indictment, adding new drug charges against an additional five defendants. In total, ten individuals other than Rosenzweig ultimately were arrested, charged and either pled guilty or were found guilty of criminal offenses relating to the drug conspiracy orchestrated by Rosenzweig.[5]

On May 9, 1996, Rosenzweig was transferred from a local detention facility, where he had been awaiting trial, to a federal prison hospital after being diagnosed with terminal cancer. On July 8, 1996, he was returned to his Sandisfield residence, subject to electronic monitoring and various other restrictions. Rosenzweig died from cancer on June 28, 1997.

On July 18, 1997, the Government filed this civil forfeiture action pursuant to 21 U.S.C. § 881(a)(4), (6) and (7). Notice was sent to, among others, the claimant, Diana Ziegler, who is the Executrix of and sole heir to Rosenzweig's Estate. On August 20, 1997, the criminal indictment against Rosenzweig, including the criminal forfeiture charge, was dismissed without prejudice. Thereafter, on November 18, 1997, the claimant, in her capacity as Executrix,

---

**5.** These individuals include Edward Brennan, Marjorie Brennan, Sabrina Brennan, Herbert Derman, Nicholas Pinto, Richard Haber, Kathy Vinal, Rachel Gregg, Danny Lopardo and Gerri Lopardo.

filed an Answer to the Government's civil forfeiture Complaint.

On October 2, 1998, the Government filed the motion for summary judgment now pending before the court.

## IV. *DISCUSSION*

### A. *Summary Judgment Standard*

The court may allow a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view all facts and draw all inferences in the light most favorable to the non-moving party, in this case the claimant. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir.1997).

### B. *Forfeiture Standard*

The forfeiture sought by the Government is governed by 21 U.S.C. § 881(a), which provides in pertinent part for forfeiture of the following:

(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property [including controlled substances, chemicals and related contraband] described in paragraph (1), (2), or (9) ...

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys,

negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter ...

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment....

■ The First Circuit has adopted a burden shifting scheme to determine whether items are subject to forfeiture under this statute. *See United States v. One Lot of United States Currency ($36,-634)*, 103 F.3d 1048, 1053 (1st Cir.1997); *United States v. Parcels of Real Property at 1933 Commonwealth Avenue*, 913 F.2d 1, 3 (1st Cir.1990); *United States v. One Parcel of Real Property*, 794 F.Supp. 24, 26–27 (D.Mass.1992). The Government has the initial burden of demonstrating probable cause to believe that the property is subject to forfeiture. *One Lot of United States Currency ($36,634)*, 103 F.3d at 1053. More specifically, there must be probable cause to believe that the property has a "nexus" or "substantial connection" with the illegal activity. *Id.*[6] This requirement will generally be satisfied if the items under forfeiture are shown to be proceeds of the illegal activity, derived from such proceeds or used to facilitate such activity. 21 U.S.C. § 881(a); *see also One Lot of United States Currency ($36,634)*, 103 F.3d at 1053.

■ "Probable cause to forfeit requires only a 'reasonable ground for belief of guilt supported by less than prima facie proof but more than mere suspicion' that

---

6. In the First Circuit, both the terms "nexus," *see, e.g, United States v. Parcel of Land & Residence at 28 Emery St.*, 914 F.2d 1, 3–4 (1st Cir.1990), and "substantial connection", *see, e.g., One Lot of Currency ($68,000)*, 927 F.2d 30, 32 (1st Cir.1991), have been used. The Court of Appeals, in *One Lot of United States*

*Currency ($36,634)*, 103 F.3d at 1053, n. 6, found it unnecessary under the facts presented there to resolve the issue of whether the term "nexus" means something less than "substantial connection." It is similarly unnecessary to do so under the facts of this case.

the property is subject to forfeiture." *28 Emery Street*, 914 F.2d at 3 (quoting *United States v. $250,000 in United States Currency*, 808 F.2d 895, 897 (1st Cir. 1987)). "In other words, the government has a 'relatively light burden of showing probable cause' to believe that the subject property is forfeitable." *United States v. Parcels of Property*, 9 F.3d 1000, 1004 (1st Cir.1993). A probable cause determination must be made on a case-by-case basis, viewing all of the relevant facts and circumstances presented. *See id.* The court performs its analysis based on the Government's knowledge at the time the forfeiture proceeding is instituted. *One Lot of United States Currency ($36,634)*, 103 F.3d at 1054.

■ After the Government makes a showing of probable cause, "the burden then shifts to the claimant to show by a preponderance of the evidence that the property is not subject to the forfeiture." *Id.* at 1053–54. The claimant may satisfy this burden by showing either that the property was not derived from or used to facilitate a violation of the applicable statute, or the illegal acts were done without his or her knowledge or consent. *See 28 Emery Street*, 914 F.2d at 3; *see also* 21 U.S.C. § 801(a)(4)(C), (6), (7) (each containing innocent owner clauses).

## C. *Government's Evidence of Probable Cause*

According to the Government, the undisputed facts establish probable cause for forfeiture of all the defendant properties either as derivatives of illegal drug activity or as items used to facilitate such activity in violation of 21 U.S.C. §§ 841(a)(1) and 846. Additionally, the Government argues that the claimant cannot meet her burden of showing by a preponderance of the evidence that such properties were derived from legitimate sources and not used to facilitate illegal activity. These arguments are addressed below.

### 1. *Items Used to Facilitate Illegal Drug Activity*

■ The Government has offered uncontradicted evidence implicating several of the defendant properties as having been used to facilitate Rosenzweig's illegal drug operation. The evidence clearly shows that the Sandisfield Property was utilized by Rosenzweig for a number of years to cultivate, process and package massive amounts of marijuana. Statements from several witnesses confirm the duration, magnitude and specifics of the illegal operation. Moreover, there is corroborating physical evidence recovered by law enforcement officials during their searches of the site, including marijuana plants and cuttings valued in excess of $8,000,000, a sophisticated hydroponic growing system, a total of over $1,000,000 in cash and gold, and tools, equipment and paraphernalia commonly utilized in large-scale marijuana operations. The court finds that this evidence easily establishes a reasonable belief that the Sandisfield Property was used to facilitate Rosenzweig's illegal drug operation and, therefore, is subject to forfeiture. *See* 21 U.S.C. § 881(a)(7).

Other than the defendant real property, the Government has not specifically argued in its brief how the remaining items seized were used to facilitate illegal drug activity. However, the Houle Affidavit and the Government's statement of undisputed facts set forth facts conclusively implicating additional items.

■ The Government has offered specific and credible evidence gathered during its investigation of Rosenzweig's drug operation that the 1989 Cadillac and 1994 Pontiac were both regularly used to transport marijuana to New York for sale. Such evidence is sufficient to establish the requisite connection between these vehicles and the illegal activity for forfeiture. *See id.* at § 881(a)(4).

■ The Government also has introduced evidence that Rosenzweig used a black Chevy pick-up to transport marijua-

na from the Egremont property to the Sandisfield Property. At first glance, this appears to implicate either the black 1986 or 1993 Chevy pick-up. However, this evidence is based on Catranbone's statements to investigators relating to observations she made while living with Rosenzweig between 1982 and 1990. Since the vehicle she describes could not be the 1993 pick-up, this leaves the 1986 pick-up, which the court finds was utilized to facilitate Rosenzweig's illegal drug activities. *See id.*

■ The Houle Affidavit includes information supplied by Gregg that the 1993 Chevy pick-up was used to transport fuel oil for the generator used to power growing equipment. Since the truck facilitated an essential part of the drug operation, it is subject to forfeiture. *See id.*

■ The Government's evidence also establishes that the John Deere Tractor was used in the illegal drug operation on the Sandisfield Property. The tractor, as indicated in the Houle affidavit, was discovered behind the barn during a search of the property by law enforcement officials. Based on their observations of a pile of marijuana stalks near a clearing behind the residence, law enforcement officials reasonably concluded that the tractor was used to bury plant waste. Having been used to facilitate illegal drug activity, the tractor is subject to forfeiture. *See id.*

The Government has introduced no direct evidence to establish that any of the remaining named properties in this action were utilized to facilitate Rosenzweig's illegal drug conspiracy. The court will now turn to the question whether these items were the fruits of that conspiracy.

### 2. *Derivatives of Illegal Drug Activity*

As with the property allegedly used to facilitate the illegal drug operation in this case, the Government does not point to specific properties it believes were derived, either directly or indirectly, from illegal drug activity. In essence, however, the Government's argument is that, given the duration, magnitude and profitability of Rosenzweig's illegal drug activities, probable cause exists to believe that *every* item recovered from the Sandisfield Property was derived from his drug operation.

Obviously, both the testimonial evidence and contraband recovered by law enforcement officials from the Sandisfield property establish beyond any reasonable doubt the existence of a large-scale drug operation at that site. Undisputed evidence confirms that the Sandisfield operation was in place for a number of years, that Rosenzweig previously maintained a similar operation on the Egremont property and that he was probably engaged in illegal drug activities as early as the 1970's, including marijuana smuggling. Furthermore, there is evidence that Rosenzweig received $50,000 to $70,000 bimonthly from sales relating to the Sandisfield operation, and netted a total $2,000,000 from drug smuggling before 1982.

■ Clearly, the Government has established reasonable grounds to believe that the cash and gold constitute the fruits of the drug conspiracy. *See 28 Emery Street*, 914 F.2d at 3. Possession of large amounts of cash, either on one's person or in one's home, particularly where the person has been shown to be a drug dealer or the money is found in the proximity of drugs, may be substantial factors, along with other circumstances, in justifying a conclusion that the money has been generated by drug activity. *See One Lot of United States Currency ($36,634)*, 103 F.3d at 1055 (holding under the totality of the circumstances, carrying large amounts of cash sufficient to establish probable cause for forfeiture of cash, but rejecting theory that carrying large amounts of cash is *per se* evidence of illegal activity); *Parcels of Property*, 9 F.3d at 1005 (in light of the totality of the facts, including the discovery of a large quantity of narcotics in defendant's home and defendant's suspicious answers, probable caused existed to subject cash to forfeiture). The basis for treating the possession of large sums of

cash different from possession of other items is that it is generally uncommon or unusual behavior given the multitude of secure alternatives for storing it. *See One Lot of United States Currency ($36,634),* 103 F.3d at 1055. This court, for similar reasons, holds that, under certain circumstances, possession of large amounts of gold may be suspect.

In the present case, law enforcement officials discovered a total of over $1,000,-000 in cash and gold stashed in secret spaces amid a multi-million dollar drug operation, including over $8,000,000 worth of marijuana plants and cuttings. Storing this amount of cash at home, in itself, is highly unusual. *See id.* When compounded with the illegal activity in the same home and the attempts to conceal it in hidden compartments (as opposed to merely securing it), it is more than merely suspect. *Parcels of Property,* 9 F.3d at 1005; *see also One Lot of United States Currency ($36,634),* 103 F.3d at 1055 (evasive behavior is probative of probable cause). Indeed, under these circumstances, the monies and gold cry out that they are illegal drug proceeds.

■ In contrast, there is nothing inherently or otherwise unusual or suspect about Rosenzweig's possession of vehicles, art, jewelry or the other defendant items. Moreover, the Government has offered no evidence as to when, where or how these items may have been acquired. *Cf. United States v. One Parcel of Real Property,* 921 F.2d 370, 376 (1st Cir.1990) (evidence that the bulk of defendant's cash flow for two years immediately prior to purchase of property was from illegal drug sales sufficient to show probable cause that property, at least in part, was acquired with illegal proceeds). Instead, the Government relies *solely* on the existence of a profitable illegal activity to implicate these items as proceeds. Although these facts justify strong suspicion that many, if not all, of Rosenzweig's possessions were derived from his illegal drug activities and not from legitimate sources, suspicion is not enough to establish probable cause. *See 28 Emery Street,* 914 F.2d at 3. Instead, the Government must establish reasonable grounds to believe these items represent the spoils of illegal activity, which it has failed to do. *See id.*

In sum, the Government has presented sufficient evidence to show probable cause that the defendant Sandisfield Property, 1986 Chevy pick-up, 1989 Cadillac, 1993 Chevy pick-up, 1994 Pontiac and the John Deere tractor were used to facilitate illegal drug activity. Beyond this, the Government has established probable cause to believe that the cash and gold seized from the Sandisfield Property were proceeds of or derived from illegal drug activity. Therefore, as a matter of law, the court finds probable cause for forfeiture of each of those items. As such, the burden now shifts to the claimant to show by a preponderance of the evidence that such items should not be forfeited, or some other reason why forfeiture is inappropriate. The claimant's arguments in this regard are set forth below.

### D. *Claimant's Arguments Against Summary Judgment*

The claimant has offered five arguments in opposition to the government's motion for summary judgement: (1) that Agent Houle's affidavit does not comply with the requirements of Rule 56; (2) that the Government delayed in filing this action in violation of claimant's due process rights; (3) that forfeiture of the defendant properties would violate the Eighth Amendment to the United States Constitution; (4) that there are genuine issues of material fact to be litigated at trial; and (5) that the defendant items were obtained in violation of Rosenzweig's Fourth Amendment rights. Each of these arguments is addressed below.

### 1. *Sufficiency of the Houle Affidavit*

The claimant challenges the Houle Affidavit based on the literal terms of Mass. R. Civ. P. 56, which provide that affidavits

"[s]upporting and opposing ... [summary judgment] shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." Specifically, she objects to Agent Houle's recitation of information obtained from witnesses who cooperated in the Government's investigation of Rosenzweig's illegal drug activities.

█ This argument is without merit. Clear and consistent case law in this Circuit establishes that hearsay evidence is sufficient to prove probable cause as long as there is a substantial basis for crediting such evidence. *See United States v. Parcel of Land and Residence At 18 Oakwood Street*, 958 F.2d 1, 4 (1st Cir.1992); *United States v. One 1986 Chevrolet Van*, 927 F.2d 39, 42 (1st Cir.1991); *One, Parcel of Real Property*, 794 F.Supp. 24.

█ In this case there are substantial bases for crediting the hearsay testimony in the Houle Affidavit. First, the contents of that affidavit represent the fruits of a thorough and lengthy investigation involving the consolidated efforts of both state and federal law enforcement officials. These efforts included interviews with numerous individuals, several detailed searches of both the Sandisfield and Egremont properties and the recovery of a vast amount of inculpatory physical evidence. Much of the information provided by the various witnesses was consistent and was corroborated by the overwhelming physical evidence. These circumstances provide substantial bases for crediting the information in the Houle affidavit. Therefore, the claimant's challenge of that affidavit fails.

2. *Alleged Due Process Violation*

█ Claimant has offered an affidavit from her attorney stating that the Government became aware that Rosenzweig had terminal cancer shortly after his diagnosis in May of 1996. Relying on this and *United States v. $8,850*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), the claimant alleges that the Government deliberately delayed in filing the present action and that such delay violated Rosenzweig's due process rights by precluding him from offering testimony or evidence in opposition to forfeiture in this case. The claimant's prejudicial delay argument is flawed for the four reasons set forth below.

First, the claimant's apparent notion that Rosenzweig's illness somehow triggered a duty on the part of the Government to file a civil forfeiture action has no legal or factual basis. A criminal forfeiture action involving the same properties at issue in this action was already pending at the time of Rosenzweig's diagnosis with cancer. Instituting a civil forfeiture action at that time was in no way required by law and, in fact, would have been redundant. *Cf. United States v. $8,850*, 461 U.S. 555, 557, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) ("[p]ending criminal proceedings present ... justifications for delay in instituting civil forfeiture proceedings"). Only Rosenzweig's death, which resulted in the dismissal of all of the criminal charges against him, made a civil action necessary. The Government's filing of this action approximately two weeks later was far from dilatory.

Second, Rosenzweig was represented by counsel during the criminal forfeiture proceedings. Therefore, he must have anticipated that the Government's pursuit of forfeiture would not end with his death. If he had information that could have saved his possessions from forfeiture, he could have preserved it by way of deposition or other available methods. Any prejudice resulting from his failure to do so was not caused by the Government.

Third, the claimant's reliance on *$8,850*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 is misplaced. In that case, the Government seized currency from the claimant for her alleged violation of 31 U.S.C. § 1101 in failing to declare at customs monetary instruments in excess of $5,000. *See id.* at 558–60, 103 S.Ct. 2005. The Government then failed to institute civil forfeiture proceedings until eighteen

months later. *See id.* at 560, 103 S.Ct. 2005. The Supreme Court, weighing four factors—the length of the delay, the reason for the delay, the defendant's assertion of her right, and prejudice to the defendant—held that the delay did *not* violate due process. *See id.* at 564–70, 103 S.Ct. 2005. The facts on which claimant relies in the present case are even less compelling than those relied upon in *$8,850*. The Government instituted this action almost immediately after the previously pending criminal forfeiture became unavailable due to Rosenzweig's death. As such, there is simply no evidence of delay or prejudice to the claimant.

Fourth, contrary to claimant's suggestions, the record is bereft of even a shred of evidence that the Government *deliberately* sought to capitalize on Rosenzweig's terminal illness by stalling the civil forfeiture process. As noted above, the Government acted expediently in bringing this action. For the foregoing reasons, the claimant's due process argument is rejected.

### 3. *Alleged Eighth Amendment Violation*

The claimant next asserts that the forfeiture sought in this case would violate the Excessive Fines Clause of the Eighth Amendment. In *Austin v. United States*, 509 U.S. 602, 618, 622, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), the Supreme Court was asked to review a decision by the Sixth Circuit Court of Appeals holding that an *in rem* civil forfeiture action pursuant to 21 U.S.C. §§ 881(a)(4) and (7) was subject to the Eighth Amendment's Excessive Fines Clause. *See id.* at 605–606, 113 S.Ct. 2801. The Supreme Court reversed, holding that the Excessive Fines Clause did apply. *See id.* at 622–23, 113 S.Ct. 2801.

The applicability of the Eighth Amendment to governmental action hinges on whether the purpose of such action is punishment. *See id.* at 609–11, 113 S.Ct. 2801. In *Austin*, the Supreme Court detailed the historical origins of forfeiture actions, concluding that, despite the legal fiction that in *in rem* civil forfeitures the property is the offender, such actions "in particular historically have been understood, at least in part, as punishment." *Id.* at 606–18, 113 S.Ct. 2801. Moreover, "[u]nlike traditional forfeiture statutes, §§ 881(a)(4) and (a)(7) expressly provide an 'innocent owner' defense," for acts " 'committed or omitted without the knowledge, consent or wilful blindness.' " *Id.* at 619, 113 S.Ct. 2801 (citations omitted). These exemptions, the Supreme Court held, "serve to focus the provisions on the culpability of the owner in a way that makes them look more like punishment ...." *Id.* The Court also found support in the legislative history of § 881 and Congress' decision to "tie forfeiture directly to the commission of drug offenses." *Id.* at 620, 113 S.Ct. 2801. Lastly, the Court rejected the Government's argument that §§ 881(a)(4) and (7) are solely remedial. *See Id.* at 620–22, 113 S.Ct. 2801.

In the present case, the Government seeks forfeiture under subsection (6) of 21 U.S.C. § 881(a), in addition to subsections (4) and (7), which were the focus of *Austin*. For the reasons set forth by the Supreme Court there, this court holds that subsection (6) is also, in part, punitive and, therefore, subject to Eighth Amendment scrutiny. *See United States v. Ursery*, 518 U.S. 267, 289, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (noting that § 881(a)(6) has "punitive aspects"). First, subsection (6), like the provisions considered in *Austin*, includes an "innocent owner" provision. Additionally, this provision is similarly tied to the commission of drug offenses. Lastly, the legislative history of § 881 relied upon in *Austin* is equally applicable to this provision.

In *Austin*, the Supreme Court remanded the case without providing detailed guidance as to what standard should be applied in determining whether a forfeiture is an excessive fine under the Eighth Amendment. *See id.* at 623, 113 S.Ct.

2801. However, three tests have surfaced in the courts for making this determination: (1) the "instrumentality" or "nexus" test, (2) the "proportionality" test and (3) the hybrid "instrumentality-proportionality" test. *See, e.g., United States v. One Parcel of Real Property With Bldgs.,* 4 F.Supp.2d 65 (D.R.I.1998) (discussing the three tests in detail and adopting the hybrid test). The Eighth Amendment nexus test, similar to the nexus or substantial connection approach applied above in the court's probable cause determination, focuses on the connection between the alleged wrong and the property subject to forfeiture. *See id.* at 68. The proportionality test, on the other hand, "essentially involves comparing the harshness of the forfeiture with the severity of the crime." *Id.* The hybrid test, as suggested by its label, combines the two analyses. *See id.* at 69.

In a recent decision, *United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the Supreme Court adopted the proportionality approach in a case involving an *in personam* criminal forfeiture action under to 18 U.S.C. § 982(a). *See id.* at 2036.[7] The Court held that a forfeiture violates the Excessive Fines clause if it is "grossly disproportional to the gravity of the defendant's offense...." *Id.* at 2023. In the context of that case, the Court considered whether the offense was related to other illegal activities, the potential penalties for the defendant's offense and the harm caused by the offense. *See id.* at 2038–39.

The Supreme Court has not directly addressed whether the grossly disproportional standard would apply to *in rem* civil forfeiture actions such as this, where the underlying statute is, at least in part, punitive. However, the Court, in fashioning this test, focused on the punitive nature of the forfeiture at issue, noting that "the test for the excessiveness of a *punitive* forfeiture involves solely a proportionality determination." *Id.* at 2038 (emphasis added); *see also Austin,* 509 U.S. at 610, 113 S.Ct. 2801 (noting that "the question [with respect to the application of the Eight Amendment] is not ...: whether forfeiture under § 881(a)(4) and (a)(7) is civil or criminal, but rather whether it is punishment"). This analysis suggests, as other courts have recognized, that the *Bajakajian* test may apply to Section 881(a) forfeitures. *See, e.g., United States v. 817 N.E. 29th Drive,* 175 F.3d 1304 (11th Cir.1999) *and United States v. 415 East Mitchell Ave.,* 149 F.3d 472, 476 (6th Cir.1998) (applying the grossly disproportional standard to Section 881(a) forfeitures).

■ The appropriate Eighth Amendment test to apply in civil forfeiture actions pursuant to 21 U.S.C. § 881(a) post *Bajakajian* has not been decided in the First Circuit. The issue need not be resolved in this case because forfeiture here easily survives Eighth Amendment scrutiny under both the nexus and the gross disproportionality test.

The court has already determined for purposes of probable cause that a nexus or substantial connection exists between the defendant properties and the offenses with which Rosenzweig was charged, either as derivatives or items used in the facilitation of such offenses. The underlying bases of that determination similarly preclude a successful challenge under the Eighth Amendment nexus test.

The gross proportionality test also does not assist the claimant. Rosenzweig, prior to his death, was charged in a major drug conspiracy involving millions of dollars worth of marijuana.. The physical and testimonial evidence supporting the charges were overwhelming. As the ringleader of

---

**7.** The defendant in *Bajakajian* was charged with failing to report that he was transporting funds in excess of $10,000 out of the United States in violation of 31 U.S.C. § 5316(a)(1)(A). *Id.* at 2031. The Supreme Court held, in a five to four decision, that forfeiture of $357,144, which the defendant was carrying, violated the Eighth Amendment.

the conspiracy, Rosenzweig would have faced decades in prison and millions of dollars in fines if convicted. A total of ten others have either pled to or been convicted of offenses related to the conspiracy and have faced lengthy sentences and substantial fines. Under the facts and circumstances of this case, the forfeiture sought by the Government is, by no means, grossly disproportional to the gravity of Rosenzweig's offenses. Accordingly, claimant's Eighth Amendment defense does not save her claim.

### 4. *Alleged Issues of Material Fact*

 The claimant's third argument is that there are genuine issues of material fact as to whether she can meet her burden of showing that the items of personal property named in this case were derived from legitimate sources. Claimant relies solely on testimony from Barbara Derman at the criminal trial of her husband regarding Rosenzweig's alleged legitimate business dealings and gambling. As addressed earlier, the court has, for reasons unrelated to Ms. Derman's testimony, concluded that there is sufficient probable cause to justify forfeiture only of a portion of the defendant properties. Thus, at this point, the burden has shifted to the defendant to establish a material issue of fact only as to this segment of the targeted properties. For the reasons set forth below, the claimant has failed to do so.

Other than noting that Rosenzweig was "very successful" with respect to the purchase of racehorses, Ms. Derman did not testify as to *any* income Rosenzweig may have received from any of his alleged ventures. Claimant has introduced no employment records, tax returns or any other evidence that Rosenzweig received anything other than illegal income. Although the court, for purposes of summary judgment, accepts as true Ms. Derman's testimony regarding Rosenzweig's possible legitimate business dealings, the court cannot make the broad leap from these vague statements to the conclusion

that those dealings were in fact lucrative enough to generate over a million dollars in cash and gold. *See, e.g., Parcels of Property,* 9 F.3d at 1005 (noting that even three possible sources of innocent income may not be sufficient to vitiate government's showing of probable cause); *United States v. $41,305 in Currency and Traveler's Checks,* 802 F.2d 1339, 1345 (11th Cir.198) ("[w]here the government has presented evidence of an illegal source, the claimant must do more than show the existence of possible legitimate sources of cash."). Therefore, the court finds that Ms. Derman's prior testimony does not create any material issues of fact.

### 5. *Alleged Fourth Amendment Violations*

The claimant's last argument is that the defendant properties were seized in violation of Rosenzweig's Fourth Amendment right to be free from unreasonable searches and seizures. Specifically, the claimant challenges the affidavits on which various warrants to search the Sandisfield and Egremont properties were based.

Rosenzweig raised claimant's Fourth Amendment argument during the criminal proceedings against him. After extensive briefing by both the Government and Rosenzweig, Magistrate Judge Neiman issued a Report and Recommendation recommending Rosenzweig's motion to suppress on Fourth Amendment grounds and motion for a *Franks* hearing be denied. Following objections to the Report and Recommendation by Rosenzweig, further briefing by the parties and a *de novo* review by the court, the court adopted the Magistrate Judge's Report and Recommendation and denied both motions.

Claimant now asks the court to consider the Fourth Amendment issue for a third time, pointing to additional submissions made to the court by Rosenzweig in the criminal action following the denial of his motion to suppress and for a *Franks* hear-

ing. The court has reviewed the original motions and the additional submissions and has found nothing to change its initial ruling. Therefore, the claimant's Fourth Amendment argument does not rescue her claim from summary judgment.

### E. *Supplemental Briefs*

Although the record is sufficient to establish the requisite nexus for forfeiture of the defendant properties for which the court has found probable cause, the government has not focused its attention on the remaining items, and therefore, the court is unable to conclude that probable cause exists for forfeiture of these items. Accordingly, the court will request that the Government submit a supplemental brief and supporting documentation specifically addressing why probable cause exists for the remaining defendant properties. The court will also give the claimant an opportunity to respond with a supplemental opposition and supporting documentation.[8]

### V. *CONCLUSION*

The Government has met its burden of showing probable cause that the following named properties are subject to forfeiture: the Sandisfield Property; one 1994 Pontiac Transport vehicle; one 1986 Chevrolet pick-up; one 1993 Chevrolet pick-up; one 1989 Cadillac Allante vehicle; one John Deere tractor; one lot of $614,900; one lot of $15,820; one lot of $191,700 and one lot of sixteen gold bars. Because the claimant has failed to establish that she will be able to show by a preponderance of the evidence that such items were not used to facilitate or derived from illegal drug activity, the court will allow summary judgement as to each of these items.

The Government has, at this point, failed to show that probable cause exists for forfeiture of the following remaining defendant properties: one 1980 Harley Davidson motorcycle; one 1990 Hover Craft; one 1975 Lincoln Continental; one

Red Mac Roll Away Tool System; one diamond ring; one set of emerald earrings; and 76 pieces of art work. Additional briefs and supporting documentation with respect to these items will be submitted by July 9, 1999.

A separate order will issue.

---

8. The court's ruling is not meant to discourage the parties from communicating to reach an amicable settlement as to the remaining items of property.