

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-2001

# United States v. $10700 US Currency

Precedential or Non-Precedential:

Docket 00-1635

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. $10700 US Currency" (2001). *2001 Decisions.* Paper 161.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/161

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 19, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1635

UNITED STATES OF AMERICA

v.

TEN THOUSAND SEVEN HUNDRED DOLLARS
AND NO CENTS ($10,700.00) IN UNITED STATES
CURRENCY; ALLAN JOHNSON
(Delaware District Court No. 98-cv-00600)

UNITED STATES OF AMERICA

v.

TWENTY ONE THOUSAND FOUR HUNDRED
AND SIXTY DOLLARS AND NO CENTS ($21,460.00)
IN UNITED STATES CURRENCY
(Delaware District Court No. 98-cv-00603)

Allan Johnson; *Jermaine P. Thomas,
        Appellants

*(Pursuant to F.R.A.P. 12(a))

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 98-cv-00600, 98-cv-00603)
District Judge: Honorable Sue L. Robinson

Argued March 15, 2001

Before: RENDELL, AMBRO, and BRIGHT,*
Circuit Judges
_____

* Hon. Myron H. Bright, Senior Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

(Filed: July 19, 2001)

Joseph M. Bernstein, Esq.
 [ARGUED]
300 Delaware Avenue
Wilmington, DE 19801
 Counsel for Appellants
Allan Johnson
Jermaine P. Thomas

Paulette Nash, Esq. [ARGUED]
Office of United States Attorney
1201 Market Street, Suite 1100
P. O. Box 2046
Wilmington, DE 19899-2046
 Counsel for Appellee
United States of America

OPINION OF THE COURT

RENDELL, Circuit Judge.

This civil forfeiture proceeding stems from the government's seizure of $21,460.00 and $10,700.00 in United States currency from claimants Allan Johnson and Jermaine Thomas, respectively, after they were stopped for a traffic violation while driving on Interstate 295 outside of Wilmington, Delaware. Claimants appeal the District Court's determination that the government's seizure of the currency did not violate the Fourth Amendment, and its conclusion that the government met its burden of establishing probable cause to institute forfeiture proceedings against the currency pursuant to 21 U.S.C. S 881(a)(6) (1999). Because we agree with the claimants' position that the government failed to establish that it had probable cause to commence forfeiture proceedings, we will reverse the District Court's Decree of Forfeiture entered on April 28, 2000, and remand the matter with directions that the District Court enter judgment in favor of the claimants. Given our disposition, we need not, and will not, address claimants' Fourth Amendment challenge to the seizure of the currency.

2

I. FACTS and PROCEEDINGS

A. Factual Background

The outcome of this appeal depends upon the legal significance we ascribe to the facts surrounding the forfeiture of the currency, and we are constrained in this respect by the government's agreement to stipulate to a bare record of agreed facts, which we fully set forth here. At 10:12 a.m. on April 29, 1998, Officer McManus of the Delaware River and Bay Authority ("DRBA") stopped a rented Ford Taurus for traveling 60 miles per hour in a 50 mile per hour zone. The vehicle was occupied by three individuals: Antonio Whitfield, the driver; claimant Jermaine Thomas, who was located in the front passenger seat; and claimant Allan Johnson, who was in the back seat. All three occupants exited the vehicle and provided identification indicating that they were from Wilmington, North Carolina. Whitfield also provided the rental car agreement which listed the lawful driver as Thomas, despite the fact that Whitfield was driving when McManus stopped the car.

McManus's police report indicated that she questioned each occupant individually concerning the group's travel plans. Whitfield told McManus that they were going shopping, but that he was not sure where. McManus also noted that Whitfield's hands were shaking and that he avoided making eye contact with her. Thomas and Johnson told McManus that they were going to northern New Jersey to visit family. McManus observed that Thomas also avoided making eye contact with her.

McManus obtained consent to search the vehicle. During a check of the interior, she noticed a strong odor of air freshener, but did not find any weapons or contraband. Upon searching the trunk, McManus found two bags-- a black duffel and a blue backpack. She also noticed two cellular telephones and cologne. Johnson claimed ownership of the blue backpack and consented to McManus examining its contents. McManus opened the blue backpack and found clothes at the top; underneath the clothes she discovered a blue plastic bag, and inside

3

the blue plastic bag was another blue plastic bag tied at the top. Inside the interior blue plastic bag was an unknown amount of United States currency rubber-banded together. Johnson claimed ownership of the money, advised that it was $21,000, and that the group was en route to buy a car.

Thomas claimed ownership of the black duffel bag and also consented to McManus examining its contents. McManus searched the bag and found clothing; under the plastic liner of the duffel bag, she found a second unknown quantity of United States currency that was rubber-banded in a similar fashion as the first amount she found. Thomas stated that there was $8,000 in the bag. Johnson and Thomas confirmed that they did not have receipts for the currency.

After completing the search, at approximately 10:30 a.m., McManus decided to transport the currency back to the DRBA troop for further investigation. She also requested that the claimants ride with her back to the DRBA troop, which they did. Upon arrival, Thomas and Johnson were searched and questioned, but both refused to provide any information other than personal data. During the search, DRBA officers found $2,950.00 in cash on Thomas's person, rubber-banded in a fashion similar to the money found in the trunk of the car. They also found $430.00 in cash on Johnson's person. At some point thereafter, Officer Creighton spoke with Enterprise Rental Car Company and discovered that the lease agreement under which the vehicle had been rented provided that the vehicle was not to be driven north of the Virginia border. Also, at approximately 12:30 p.m., Officer Penrod spoke with an officer at the Wilmington, North Carolina Police Department, who advised him that each of the men lived in an area known for high drug activity, and that Johnson had murder charges pending against him. At some point between 12:05 p.m. and 2:05 p.m., Officer Thompson conducted a canine detection test. The record indicates that the test "gave positive indications on the currency" but offered "negative indications" with respect to the interior and exterior of the vehicle. Between 2:00 p.m. and 3:00 p.m., officers issued two traffic citations to Whitfield and transported all three occupants to the Wilmington,

4

Delaware bus station to return home to North Carolina. The DRBA kept the currency and the cell phones. Claimants were not charged with any illegal activity other than the traffic citations.

Between 2:47 p.m. and 3:11 p.m., DRBA Sergeant Gaworski vacuumed the automobile and the currency, and subjected both to an ION Scan Analysis. The graphs, which purportedly show the results of the ION Scan on the items in the vehicle, are included in the record. Agent David Allegretto of the Drug Enforcement Agency ("DEA") stated in an affidavit that the results of this test indicated "that the monies showed high levels of cocaine residue, an indication that the monies were involved in drug trafficking," A-12, but the affidavit does not explain more specifically how he arrived at that conclusion by reviewing the graphs provided.

DRBA officers subsequently performed criminal histories on all three persons in the vehicle. Whitfield, the driver, had no criminal history. Claimant Thomas had been convicted of one drug offense -- conspiracy to traffic in cocaine on February 7, 1995. Claimant Johnson had been convicted of several drug offenses, including (1) possession of controlled substances on August 16, 1989, and August 3, 1992; (2) possession of cocaine on November 12, 1994; and (3) possession with intent to sell and distribute narcotics on March 14, 1996.[1]

B. Proceedings in the District Court

Based on the evidence collected in the field and at the DRBA troop, the government filed two verified complaints of forfeiture in rem against the currency pursuant to 21 U.S.C. S 881(a)(6).[2] The complaints averred that forfeiture was justified under the statute because the currency was "used or intended to be used to facilitate a drug transaction and/or constitutes proceeds traceable to a drug transaction." Agent Allegretto of the DEA stated in an

_____

1. As noted above, Johnson also had murder charges pending against him.

2. The District Court consolidated the two in rem proceedings by order dated November 29, 1998.

5

affidavit that, based upon the information learned during the stop and subsequent investigation, the government's forfeiture was based on the theory that "the subjects were on their way to New Jersey to purchase drugs to take back to Wilmington, North Carolina for sale." A–13.

After Johnson and Thomas filed claims of ownership of the currency, they filed a motion for summary judgment, arguing that the currency was seized in violation of their Fourth Amendment rights, and that consequently, the evidence collected at the DRBA troop could not be used in determining if there was probable cause to institute forfeiture proceedings. They also claimed that even if the government could utilize the "pre-seizure" and"post-seizure" evidence, it was insufficient to satisfy its threshold burden of establishing probable cause to institute forfeiture proceedings.

The District Court entered an order denying claimants' motion for summary judgment. First, the Court rejected claimants' Fourth Amendment challenge to the seizure, finding that McManus had probable cause to detain the currency and subject it to further investigation based upon the information she had gathered up to that point during the encounter with the claimants. In finding probable cause, the Court recognized that these facts, "if viewed through the lens of a scholarly analysis, are consistent with innocent travel," but went on to conclude "that the degree of suspicion that attaches to these particular non-criminal acts via the experience of this law enforcement officer is sufficient to pass probable cause muster." 3 A–21 to –22. Second, having found that the seizure was supported by probable cause, the Court held "that the government carried its burden of proof " in the forfeiture action, because the totality of the information was sufficient to establish probable cause that the currency was subject to forfeiture pursuant to S 881(a)(6).

---

3. Despite the District Court's reliance on McManus's experience, we were unable to locate evidence anywhere in the record of that experience or any training that might inform her evaluation of the criminal nature of this admittedly non-criminal activity.

After the Court denied claimants' summary judgment motion, the parties entered into a "Stipulation for Entry of a Decree of Forfeiture," in which claimants reserved their right to appeal. The Court entered the Decree of Forfeiture, and this appeal followed.

## II. JURISDICTION and STANDARD OF REVIEW

The District Court exercised subject matter jurisdiction over the forfeiture action pursuant to 28 U.S.C.SS 1345 and 1355. United States v. RR # 1, Box 224 , 14 F.3d 864, 868 (3d Cir. 1994). We have appellate jurisdiction pursuant to 28 U.S.C. S 1291, and we review the District Court's probable cause determination de novo. E.g., United States v. Conley, 4 F.3d 1200, 1204 (3d Cir. 1993); United States v. $191,910.00 in United States Currency, 16 F.3d 1051, 1071 n.43 (9th Cir. 1994); United States v. $250,000 in United States Currency, 808 F.2d 895, 897-98 (1st Cir. 1987).

## III. DISCUSSION

Claimants first contend that the District Court erred in finding that the seizure of the currency was lawful under the Fourth Amendment because it was supported by probable cause. They maintain that the facts within McManus's knowledge, up to the point at which she informed claimants that she was seizing the currency for further investigation, gave rise only to a "reasonable suspicion," and not probable cause, to detain the currency. Second, claimants urge us to reverse the District Court's determination that the government had probable cause to institute forfeiture proceedings, a necessary prerequisite under S 881(a)(6), claiming that the facts within the government's knowledge at the time that it filed the in rem complaints were insufficient to establish a nexus between the currency and any predicate drug activity by claimants. As indicated above, we will decide this appeal on the latter basis.

In civil forfeiture cases instituted pursuant toS 881(a)(6), S 881(d) mandates that United States customs procedures govern the allocation of the parties' burdens of proof. United States v. RD 1, Box 1, 952 F.2d 53, 56 (3d Cir. 1991).

7

Accordingly, the procedures found in 19 U.S.C. S 1615 for customs forfeitures apply. Id. Section 1615 provides:

> S 1615. Burden of Proof in forfeiture proceedings
>
> In all suits or actions . . . brought for . . . forfeiture . . ., where the property is claimed by any person, the burden of proof shall lie upon such claimant; Provided, That probable cause shall be first shown for the institution of such suit or action, to be judged . .. by the court.

Id. (emphasis added). Thus, the government bears the initial burden of establishing that it had probable cause to believe that the currency was subject to forfeiture at the time that it filed the forfeiture complaints in the District Court. If the District Court determines that the information relied upon by the government is sufficient to establish probable cause that the currency may be forfeited, the procedure set forth in S 1615 shifts the burden to the claimant to show by a preponderance of the evidence that he or she has a defense to the forfeiture. E.g. , United States v. One 1973 Rolls Royce, 43 F.3d 794, 804 (3d Cir. 1994). However, if the government has failed to satisfy its initial burden of demonstrating probable cause for the forfeiture proceeding, the claimants need not come forward with evidence to rebut the government's proofs. E.g. , United States v. $506,231 in United States Currency, 125 F.3d 442, 451 (7th Cir. 1997).

Three elements must be present in order to subject a claimant's property to civil forfeiture pursuant to 21 U.S.C. S 881(a)(6): (1) the subject property must be moneys, negotiable instruments, securities, or other things of value; (2) there must be probable cause to believe that there exists illicit drug activity that renders the seized property subject to forfeiture; and (3) there must be probable cause to believe that a connection, or nexus, exists between the seized property and the predicate drug activity the government has identified.4See, e.g., RR # 1, Box 224, 14

---

4. In their briefs, claimants contend that the government must establish probable cause to believe that a "substantial connection" exists between the seized currency and an illicit drug exchange. However, at oral

8

F.3d at 869; see also United States v. $22,474.00 in United States Currency, 246 F.3d 1212, 1215–16 (9th Cir. 2001) (stating that government must have "reasonable grounds to believe that the [money] was related to an illegal drug transaction"). Under S 881(a)(6), both the illicit drug activity that renders the property subject to forfeiture and the currency's connection or nexus to it can be established by pointing to credible evidence establishing probable cause to believe that the property at issue either: (1) was"furnished or intended to be furnished" in exchange for a controlled substance; (2) constitutes "proceeds traceable" to a drug exchange; or (3) was "used or intended to be used to facilitate" a violation of federal drug laws. 21 U.S.C. S 881(a)(6);5 e.g., United States v. One Lot of United States

_____

argument, claimants' counsel admitted that he was unsure what, if anything, the adjective "substantial" added to the probable cause analysis. We recognize that some of our sister circuits have described the government's initial burden as requiring it to demonstrate a "substantial connection," while others have used language such as "nexus" or some "connection." Compare, e.g., United States v. $5,000 in United States Currency, 40 F.3d 846, 849 (6th Cir. 1994) (noting that government must establish probable cause to believe there is a"substantial connection" between the money and a controlled substance exchange), and United States v. $38,600.00 in United States Currency, 784 F.2d 694, 697 (5th Cir. 1986) (same) with $506,231.00 , 125 F.3d at 451 ("Probable cause for the forfeiture exists if the government demonstrates a nexus between the seized property and illegal narcotics activity.") (emphasis added), and United States v. One Lot of United States Currency ($36,634), 103 F.3d 1048, 1053 (1st Cir. 1997) ("[T]he government must show that it has probable cause to believe that the property had the requisite nexus to a specified illegal purpose.") (emphasis added). While we have previously noted in passing that the distinction between "substantial connection" and "nexus" or"some connection" "appears to be semantical," RD 1, Box 1, 952 F.2d at 58 n.5, we need not decide whether the various tests are substantively different. Assuming that the government is correct that it need only establish probable cause to believe that the money bears a connection or nexus to an illicit drug transaction, rather than a "substantial connection," we find that it has not met its burden in that regard.

5. The full text of S 881(a)(6) provides:

    The following shall be subject to forfeiture to the United States and
    no property right shall exist in them:

9

Currency ($36,634), 103 F.3d 1048, 1053 (1st Cir. 1997);
United States v. $30,060.00 in United States Currency, 39
F.3d 1039, 1041 (9th Cir. 1994). The government may
establish probable cause for the existence of the underlying
drug activities and the currency's nexus to the illicit
conduct by relying on circumstantial evidence. E.g., United
States v. $4,225,000.00 in United States Currency , 762 F.2d
895, 904 (11th Cir. 1985).

In determining whether the government's proofs are
sufficient to pass the probable cause threshold, we point
out initially that the facts of this case do not present the
"typical" forfeiture scenario we have previously addressed
under S 881(a) in which the claimants' property, real or
personal, can be linked to a narcotics violation because the
property was seized as a consequence of a police
investigation, arrest or conviction for an underlying drug
crime.6 Moreover, this case is also unusual because the

_____

          (6) All moneys, negotiable instruments, securities, or other things
of
          value furnished or intended to be furnished by any person in
          exchange for a controlled substance or listed chemical in violation
of
          this subchapter, all proceeds traceable to such an exchange, and
all
          moneys, negotiable instruments, and securities used or intended to
          be used to facilitate any violation of this subchapter.

6. We recognize, of course, that forfeiture underS 881(a) is not
conditioned upon an arrest or conviction for a drug offense. We merely
point out that the link between an underlying drug crime and the seized
property certainly is more apparent where the forfeiture is the product of
an associated drug arrest, conviction or targeted investigation of the
claimant. E.g., One 1973 Rolls Royce, 43 F.3d at 802-03 (forfeiture
followed conviction for RICO violations predicated on identifiable drug
activities to which car could be linked); RR # 1, Box 224, 14 F.3d at 869
(finding that government established probable cause to institute
forfeiture proceedings against real property underS 881(a)(7) where civil
forfeiture followed defendant's conviction for narcotics offenses, and
issue was whether government's evidence sufficiently linked premises to
claimant's cocaine distribution activities); United States v. 717 S.
Woodward St., 2 F.3d 529, 531-32 (3d Cir. 1993) (stating that evidence
of convicted defendant's drug activities on his properties gave rise to
probable cause to institute civil forfeiture proceeding against real
properties under S 881(a)(7); facts concerning defendant's drug activities

government has not presented any evidence whatsoever from which it could be inferred that claimants were involved in any drug exchange at or around the time that the government instituted forfeiture proceedings. 7 As a

_____

on premises were not disputed); RD 1, Box 1, 952 F.2d at 54-55 (stating that probable cause to forfeit existed where claimant was convicted of drug offenses and civil forfeiture proceeding followed; only question was whether real property was sufficiently connected to known drug violations so as to subject it to forfeiture underS 881(a)(7)); United States v. 92 Buena Vista Ave., 937 F.2d 98, 101, 104 (3d Cir. 1991) (stating that government had probable cause to institute forfeiture proceedings against real property under S 881(a)(7), as forfeiture arose out of indictment of defendant for narcotics violations, and government provided evidence indicating that claimant purchased home with proceeds from defendant's narcotics activities that were the subject of the indictment), aff 'd, 507 U.S. 111 (1993); United States v. 6109 Grubb Rd., 886 F.2d 618, 620 (3d Cir. 1989) (forfeiture proceeding followed investigation revealing that the defendant had used the property to further drug trafficking, and defendant was convicted for those offenses; claimant conceded that government had probable cause to forfeit based upon her husband's conviction and information gathered in criminal case); United States v. $55,518.05 in United States Currency, 728 F.2d 192, 196 (3d Cir. 1984) (finding that government had probable cause to seize currency under S 881(a)(6) on theory that it was intended to be used to purchase drugs because it had been seized in connection with claimant's arrest for attempted narcotics purchase); United States v. Bush, 647 F.2d 357, 361 (3d Cir. 1981) (civil forfeiture of currency and vehicle followed from claimant's conviction for narcotics violations); United States v. One 1977 Lincoln Mark V. Coupe, 643 F.2d 154, 156-57 (3d Cir. 1981) (forfeiture proceeding followed claimants' drug arrest; only issue was whether car was sufficiently involved in observed drug transaction to subject it to forfeiture under "facilitation theory").

7. We have not overlooked the fact that the Allegretto affidavit alleges that, subsequent to the DRBA's seizure of the claimants' currency, claimant Johnson was arrested twice for narcotics violations in North Carolina. However, the government has not relied upon these allegations of subsequent arrests to uphold the District Court's probable cause determination, the statement remains uncorroborated in the record, and the record does not reveal the ultimate disposition of the charges. Moreover, the parties' stipulation of facts filed in the District Court did not recite the allegation in the Allegretto affidavit on this issue. Given the government's apparent disregard of the subsequent arrests, and in the absence of any information concerning the ultimate disposition of the

11

matter of logic, circumstantial evidence implicating claimants in recent drug activities, such as, for example, evidence of claimants' contemporaneous affiliation with known drug traffickers, or claimants' possession of drugs or drug paraphernalia at the time of the seizure, would support the government's theory that the money in claimants' possession is connected to illegal drug trafficking. If presented by the government, such evidence would have provided a strong, albeit inferential, present link between claimants' currency and the drug trade, and would have provided a more compelling case for forfeiture under S 881(a)(6). Here, however, the government does not dispute that McManus did not find drugs or drug paraphernalia in claimants' vehicle, and it does not point to any reliable evidence of a similar nature from which it can be inferred that claimants were involved in drug activities at or around the time the government seized the currency and filed the forfeiture complaint.8

---

charges, we attach no significance to Allegretto's statement. Cf., e.g., United States v. $215,300 in United States Currency , 882 F.2d 417, 419 (9th Cir. 1989) (holding that claimant's previous arrest for marijuana trafficking was not probative in forfeiture proceeding because it had been dismissed).

8. In several cases, other courts of appeals have found that the government had probable cause to institute forfeiture proceedings against currency where the government presented reliable direct or circumstantial evidence of claimants' contemporaneous involvement in drug activities. E.g., $36,634, 103 F.3d at 1051, 1054-55 (stating that circumstantial evidence was sufficient to show currency's link to drug activities where claimant associated with known drug traffickers who had been recently arrested for importing marijuana, and claimant planned to take identical route as drug traffickers); United States v. $149,442.43 in United States Currency, 965 F.2d 868, 876-77 (10th Cir. 1992) (finding that large amount of hidden currency, presence of drug paraphernalia, including packaging supplies and drug notations reflecting large drug transactions, established probable cause to forfeit currency); United States v. $91,960.00 in United States Currency, 897 F.2d 1457, 1462-63 (8th Cir. 1990) (finding probable cause to forfeit currency because, inter alia, claimant was found with large sum of money and a notebook that appeared to be a record of drug transactions, and had been convicted of drug crime one year after forfeiture); United

12

We are aware, of course, that the government need not link the currency to "a particular identifiable illicit drug transaction" among several to forfeit the money on the theory that it constitutes drug proceeds. E.g. , United States v. 92 Buena Vista Ave., 937 F.2d 98, 104 (3d Cir. 1991), aff 'd, 507 U.S. 111 (1993); United States v. Carrell, 252 F.3d 1193, 1200 & n.8 (11th Cir. 2001). Also, the government need not produce direct proof of a narcotics nexus to meet its burden of establishing probable cause for the forfeiture. Nevertheless, the quality of the circumstantial evidence that the government does proffer to establish probable cause to institute forfeiture proceedings must be strong enough to support reasonable grounds for belief that an actual, rather than purely theoretical,

_____

States v. Padilla, 888 F.2d 642, 645 (9th Cir. 1989) (finding probable cause to forfeit currency where claimant was under police surveillance at the time of the forfeiture because he was suspected of engaging in narcotics transactions, and police searched associates' homes and found drugs; court found that government presented evidence that claimant "had recently been involved in a drug transaction"); $215,300, 882 F.2d at 419 (finding probable cause, relying upon fact that claimant's airline ticket was issued by Miami travel agency that had issued airline tickets for 20 to 30 other travelers from whom police had previously seized narcotics-related currency); United States v. $5,644,540.00 in United States Currency, 799 F.2d 1357, 1363 (9th Cir. 1986) (finding that probable cause existed based upon, inter alia , presence of cocaine in suitcase containing money and circumstantial evidence that claimant was connected to motel known as site for drug transactions); United States v. 13,000 in United States Currency, 733 F.2d 581, 585 (8th Cir. 1984) (stating that government had probable cause to forfeit currency based upon evidence of drug paraphernalia found on claimant's person at time of seizure and fact that, the day before the seizure, claimant made phone calls to same apartment in New York that he called just prior to his 1981 drug distribution arrest); United States v. $93,685.61 in United States Currency, 730 F.2d 571, 572 (9th Cir. 1984) (per curiam) (finding that government had probable cause to forfeit currency when claimant was arrested for drug violation and subsequent search of house found currency, drug paraphernalia and drugs); United States v. $84,000 in United States Currency, 717 F.2d 1090, 1099–1100 (7th Cir. 1983) (finding probable cause based on claimants' admissions that they intended to purchase drugs in Florida with currency and additional fact that police found narcotics with currency).

13

connection exists between the currency in claimants' possession and the drug trade. See, e.g., RR # 1, Box 224, 14 F.3d at 869 (stating that the government must "establish some connection between the alleged criminal [drug] activity and the defendant property the government seeks to forfeit"); see also $36,634.00, 103 F.3d at 1053 (stating that probable cause for forfeiture means "reasonable grounds" for believing that the currency is connected to illegal drug activity). In our view, the government's proofs, even when considered in the aggregate, simply are not strong enough to establish probable cause to believe that there had been, or was about to be, a violation of the drug laws involving this currency.

Probable cause, as a standard of proof, "is defined as a reasonable ground for belief in guilt." United States v. 6109 Grubb Rd., 886 F.2d 618, 621 (3d Cir. 1989); see also 92 Buena Vista Ave., 937 F.2d at 101. Furthermore, "[t]he determination of probable cause in a forfeiture proceeding simply involves the question whether the information relied on by the government is adequate and sufficiently reliable to warrant a belief by a reasonable person" that the currency is connected to illicit narcotics activities. 6109 Grubb Rd., 886 F.2d at 621 (citations omitted); accord RR #1, Box 224, 14 F.3d at 869 (stating that government can meet burden if it establishes "probable cause that the property is connected to criminal activity based upon information adequate and sufficiently reliable to warrant the belief that the property was used to further the trafficking of illegal narcotics") (internal quotation marks omitted). As stated by the United States Court of Appeals for the Ninth Circuit, "to pass the point of mere suspicion, it is necessary to demonstrate by some credible evidence the probability that the money was in fact connected to drugs." $30,060.00, 39 F.3d at 1041 (second emphasis added) (internal quotation marks omitted). We determine whether probable cause exists by reviewing the aggregate facts that the government has presented. E.g. , 92 Buena Vista Ave., 937 F.2d at 104.

As we previously mentioned, the government's in rem complaint alleged, in a rather conclusory fashion, two possible connections between claimants' currency and a

14

predicate violation of the drug laws. It claimed that claimants intended to use the currency to facilitate a drug exchange, or that the currency constituted proceeds traceable to such an exchange by claimants at some point in the past. Allegretto's affidavit provided a more specific (albeit unsupported) hypothesis, namely that the money was connected to a drug exchange because the claimants were most likely traveling to New Jersey to purchase drugs with the currency.

In support of these competing forfeiture theories, the government relies on several pieces of evidence, which, in its view, demonstrate that it had probable cause to believe that the currency was connected to a completed, or intended, drug exchange. It points to the seemingly large amount of cash found in the claimants' bags and the manner of storage of the currency (rubber-banded in bundles and concealed in bag), and also the claimants' prior drug convictions. It also relies on the canine's positive reaction to the currency and the results of the ION Scan Analysis. Finally, it cites the claimants' alleged residence in a high drug activity area in Wilmington, North Carolina, claimants' allegedly suspicious conduct during McManus's questioning, their violation of the rental car agreement, their possession of cellular phones, cologne and air freshener in the vehicle, and McManus's statement characterizing I-295 as having a volume of drug trafficking.

In reviewing the sufficiency of the government's information, we " `review each piece of evidence only to determine whether it is probative, not whether it establishes probable cause standing alone.' " United States v. 255 Broadway, 9 F.3d 1000, 1004 (1st Cir. 1993) (quoting United States v. $67,220.00 in United States Currency, 957 F.2d 280, 285 (6th Cir. 1992)). And because there are " `many variables in the probable cause equation,' " each case necessarily turns on its own unique facts. Id. (quoting United States v. Maguire, 918 F.2d 254, 258 (1st Cir. 1990)).

First, we recognize that the evidence concerning the claimants' allegedly "suspicious" and nervous behavior during the traffic stop can be considered in determining whether the government had probable cause to forfeit

15

claimants' currency. E.g., United States v. $129,727.00 in United States Currency, 129 F.3d 486, 490 (9th Cir. 1997) (noting that claimant was "nervous and shaking as he spoke to officers"). However, claimants' apparent nervousness is of minimal probative value, given that many, if not most, individuals can become nervous or agitated when detained by police officers. E.g., United States v. One Lot of United States Currency ($14,665), 33 F. Supp.2d 47, 55 (D. Mass. 1998) (noting that claimant's nervousness during interaction with law enforcement officers "is not an unreasonable response, regardless of the source and intended use of the currency").

Moreover, claimants' allegedly "suspicious" behavior during the stop and their violation of the rental car agreement are not particularly probative factors because, at best, they suggest involvement in some unspecified furtive activity; they do not indicate, more specifically, that claimants had engaged, or were about to engage, in a drug sale with this currency. E.g., United States v. $5,000 in United States Currency, 40 F.3d 846, 850 (6th Cir. 1994) (stating that claimant's evasive explanation of purpose of trip provided, at best, "inchoate and unparticularized suspicion") (internal quotation marks omitted); $191,910.00, 16 F.3d at 1072 (observing that discrepancies in claimant's story raised "a suspicion that[he] was involved in illegal activities, but not probable cause"). In this regard, we further point out that claimants' "suspicious" actions consisted mostly of providing inconsistent answers concerning the destination and purpose of their trip, but the discrepancies cited by the government are not great. For example, claimants Johnson and Thomas indicated that they were traveling to New Jersey to visit family, while the driver, Whitfield, stated that they were going shopping but was not sure of their ultimate destination. When McManus discovered the currency, Johnson indicated that they were en route to purchase a car, but that explanation is not irreconcilable with their previous response that they were traveling to New Jersey to visit family, or were going shopping. In any event, to the extent that the claimants' somewhat inconsistent answers might be suggestive of possible involvement in some

16

criminal activity, we do not view the inconsistencies as a strong indication of a narcotics nexus.

Similarly, claimants' travel on Interstate 295, which Officer McManus's report characterizes as having"some volume" of drug trafficking, A-77, is a factor to be considered in evaluating the totality of the circumstances. See, e.g., $22,474.00, 246 F.3d at 1216 (noting that travel route to Phoenix, a known drug source city, is probative of probable cause to forfeit currency). Here, however, claimants' travel route is a minor consideration in the overall probable cause analysis, as travel on I-295 through Delaware is not an occurrence so "out of the ordinary" as to be even marginally suggestive of claimants' present involvement in the drug trade.9See, e.g., United States v. Sokolow, 490 U.S. 1, 9-10 (1989) (noting that innocent behavior may provide a basis for reasonable suspicion, but

_____

9. While the government also relied on the presence of cologne, cellular telephones and air freshener in the vehicle as indicators of a valid narcotics nexus, we do not view these factors as probative on this issue. Aside from the general allegation in the Allegretto affidavit that all of the
facts and circumstances indicated to him that the currency was drug-related, A-7, the government has not presented any evidence that addresses the more specific issue of whether the presence of these objects is indicative of involvement in the drug trade. In the absence of a record basis for concluding that these factors are indicative of drug-related activity, we will ascribe no significance to the presence of these items in evaluating whether the government had probable cause to institute the forfeiture. See, e.g., 30,060.00, 39 F.3d at 1044 (rejecting government's argument that drug dealers carry money in wrapped bundles and its statement that the amount involved was consistent with the cost of two kilograms of cocaine because "it provide[d] no authority for these contentions, which are, in any event, speculative"); cf. $129,727.00, 129 F.3d at 488-89 (finding probable cause to forfeit, crediting testimony by DEA agent with eight years' experience that many of claimants' actions were consistent with drug courier profile). In any event, were we to consider this information, the degree of probative value we would attach to it is minimal, as the presence of these objects is not "out of the ordinary" in the sense that few persons would possess these items while traveling. See, e.g., United States v. Sokolow, 490 U.S. 1, 8 (1989) (stating that defendant's cash purchase of two airline tickets was probative because that conduct was "out of the ordinary, and it [was] even more out of the ordinary to pay that sum from a roll of $20 bills containing nearly twice that amount of cash").

that it depends on the degree of suspicion that attaches to particular noncriminal acts); Reid v. Georgia , 448 U.S. 438, 441 (1980) ("The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."); see also $30,060.00, 39 F.3d at 1045 (distinguishing previous cases upholding forfeiture of currency where claimants had traveled on an airplane to or from a drug source city, stating that claimant was merely "driving a car when he ran a stop sign").

Moreover, the record contains no evidence in support of McManus's bald assertion that I-295 has "some volume" of drug activity and no proffer of her experience or training that might lend credibility to that assertion. Lacking a basis for this proposition, such as some recitation of her experience or training and how that experience or training supports her conclusion, we cannot credit the fact that the claimants were using a major interstate to be probative of drug trafficking. See Rivera v. Murphy, 979 F.2d 259, 264 (1st Cir. 1992) (noting that conclusions drawn from the experience and training of a police officer must be "sufficiently conveyed" so as to be understood by the average reasonably prudent person before they can support probable cause). We also point out that claimants' travel route was consistent with what they told McManus they intended to do -- travel from North Carolina to northern New Jersey to visit family and/or purchase a car-- which further mitigates the probative value of their travel on I-295. See, e.g., $36,634, 103 F.3d at 1055 (stating that claimant's assertion that he was traveling to Las Vegas to gamble and look for a pizza shop to purchase "made no sense in light of the fact that his ticket provided only a brief, middle-of-the-night layover in that Nevada city").

The government also points to the fact that the DRBA officer received information from the Wilmington, North Carolina Police Department that claimants resided in a section of Wilmington characterized as a "high drug area." However, this statement is not probative of whether the money in claimants' possession was drug-related because, unlike evidence linking claimants' actual place of residence

18

to known previous narcotics activities, e.g., United States v. $5,644,540.00 in United States Currency, 799 F.2d 1357, 1363 (9th Cir. 1986) (suspect's address was motel known as a site for drug transactions), or information concerning claimants' known association with accused drug traffickers, e.g., $36,634, 103 F.3d at 1054 (claimant associated with recently arrested, known drug traffickers), the fact that claimants reside in a neighborhood that local law enforcement officers identified as a high drug activity area does not "meaningfully relate" to any specific conduct by these claimants that could be viewed as indicative of a narcotics nexus, id. at 1055 n.9. Rather, the officer's statement is a general observation that could apply equally to many other innocent individuals who have engaged in no criminal wrongdoing, let alone a violation of the drug laws. We also think it is significant that the police officer's hearsay statement concerning claimants' neighborhood lacked any further explication and remains uncorroborated in the record, both of which weigh against a finding that the statement is probative of the currency's connection to narcotics. See, e.g., $506,231, 125 F.3d at 452 & n.7 (discounting hearsay statement in IRS agent's affidavit concerning a narcotics delivery to claimants' premises because, although it is permissible to rely on hearsay to establish probable cause to forfeit, it did not "believe that this hearsay [was] particularly reliable"); $67,220.00, 957 F.2d at 286 (discounting DEA agent's statement that he had "reason to believe that [claimant] sold cocaine" because agent "refused to offer any basis for his belief that [claimant] had sold drugs").

The government relies heavily on the remaining factors -- the positive dog sniff, the results of the ION Scan Analysis, the claimants' previous convictions, and the large amount of currency and manner of packaging (rubber-banded in large bundles) -- as establishing probable cause to believe that the money is linked to a consummated or contemplated drug transaction. Its substantial reliance on these pieces of circumstantial evidence is understandable given that they are the factors that point most directly to a contemporaneous connection between the currency and potential illegal narcotics activities by claimants. However, upon closer examination, these factors do not carry the

19

evidentiary significance that the government ascribes to them.

First, we attach no significance to the evidence derived from the post-seizure dog sniff. While we recognize that we have previously, on occasion, accepted proof of a positive canine alert as probative in other contexts,[10] we have not

_____

10. For example, in United States v. Massac , 867 F.2d 174, 176 (3d Cir. 1989), we upheld the defendant's warrantless arrest, concluding that the government had probable cause to arrest based upon an informant's tip that the defendant and her companion acted suspiciously in booking the trip from Florida, the companion's suspicious conduct upon arrival in Wilmington, Delaware, and the trained dog's positive reaction to the defendant's luggage at the train station. We found the dog sniff evidence was probative because "of the fact that trained dogs can detect the presence of concealed narcotics with almost unerring accuracy and the finding of the district court that this particular dog met the training and
reliability requirements." Id. Subsequently, in United States v. Carr, 25 F.3d 1194 (3d Cir. 1994), we affirmed the defendant's conviction for conspiracy to launder money from a specified unlawful activity -- the felonious sale and distribution of drugs -- based in part on evidence that a trained dog alerted to the money at issue. Id.  at 1202-03. Over Chief Judge Becker's dissent, we found that the positive alert to the money found in the defendant's residence was but "only one piece of evidence" tending to prove the defendant's guilt and involvement in the conspiracy, and that the cumulative weight of all of the evidence was sufficient to support the conviction. In a footnote, we specifically rejected the argument that the dog sniff evidence had no probative value because of the circumstance that a large portion of the nation's currency is tainted with drugs. Id. at 1202 n.3. This position, however, is not without its detractors. E.g., id. at 1216-17 (Becker J., concurring in part and dissenting in part) ("I am inclined to the view that the information now available establishes a strong presumption against the admissibility of evidence of a canine's alert to currency, and that the government can rebut that presumption only if it first clearly and convincingly establishes outside the presence of the jury, the relevance and non-prejudicial character of the offered evidence."); United States v. Frost, 999 F.2d 737, 745 (3d Cir. 1993) (Pollak, J., concurring) (noting that defendant's contention that probable cause to search could not be based upon result of a positive canine alert was "not .. . frivolous," but that he waived the argument by not making it in the district court). In any event, our analysis in Carr is consistent with the result we reach here because in Carr, we specifically referred to the fact that it was the results
of a "trained" dog alert that were admitted in the district court. Carr, 25
F.3d at 1203.

20

yet considered the extent to which a positive canine alert on a bundle of money is probative in assessing the 653<!>government's probable cause to forfeit that currency

pursuant to S 881(a)(6) based on its connection to drug trafficking. We note, however, that several of our sister circuits recently have called into question the evidentiary significance of a positive reaction to currency in determining whether there is probable cause to forfeit the money in light of studies indicating that a large percentage of United States currency is contaminated with sufficient traces of drug residue to cause a canine to "alert" to it. E.g., $506,231, 125 F.3d at 453 ("[W]e are unwilling to take seriously the evidence of the post-seizure dog sniff. . . . Even the government admits that no one can place much stock in the results of dog sniffs . . . ."); $5,000, 40 F.3d at 849 ("We likewise find the evidentiary value of the . . . dog sniff minimal."); $30,060.00, 39 F.3d at 1043 (finding that probative value of a dog's positive alert in Los Angeles "is significantly diminished" because of the evidence of widespread contamination in that geographical area, and stating that reliance on such evidence to separate "legitimate currency from drug-connected currency is logically indefensible") (internal quotation marks omitted).

Nevertheless, for our purposes, we need not determine, as a general matter, the evidentiary weight that should be given to a positive dog reaction to seized currency. We agree with claimants' position that, on the facts of this case, the government's evidence of the dog's positive alert to the currency is not probative of whether the money can be connected to a drug exchange, because the government has not presented any evidence concerning this particular dog's past training and its degree of accuracy in detecting narcotics on currency. Therefore, we have no record basis for concluding that this evidence bolsters the government's case. See United States v. Carr, 25 F.3d 1194, 1203 (3d Cir. 1994) (accepting proof of positive alert by "trained" canine as evidence tending to support conviction); United States v. Massac, 867 F.2d 174, 176 (3d Cir. 1989) (concluding that the positive canine alert on defendant's luggage gave police probable cause to arrest, relying in part on District Court's conclusion that canine "met the training and reliability requirements"); $67,220.00, 957 F.2d at 285-86 (stating

21

that, as a general principle, a positive dog reaction is "strong evidence" of drugs, but that, on the record, it was probative but "weak" consideration because there was "no indication in the record as to the trustworthiness of this particular dog"; court ultimately upheld forfeiture based on strength of other evidence); see also $22,474.00 , 246 F.3d at 1216 (accepting evidence of positive dog sniff as probative of whether money was connected to illicit drug trafficking where evidence confirmed that dog would not alert to cocaine residue found on currency in general circulation); United States v. $215,300 in United States Currency, 882 F.2d 417, 419 (9th Cir. 1989) (finding that government had probable cause to forfeit where government relied on, inter alia, "uncontradicted trial testimony establish[ing] that the particular police dog had an unblemished record for detecting narcotics"). Thus, even were we to assume that, on a sufficiently developed record, a dog sniff could carry some probative value in determining whether the currency is connected to a drug crime, the positive alert in this case does not rise to the level of credible evidence tending to link this currency to narcotics activities by claimants.

We reach the same conclusion with respect to the evidentiary significance of the results from the ION Scan Analysis on the currency and the car. The government simply has not produced evidence concerning the reliability of this particular testing process or the training and qualifications of the tester, two factors which, of course, bear on the reliability and accuracy of the results. Instead, the parties' stipulation of facts merely incorporates the test results without providing any explanation of how the test measures the levels of narcotics on the currency, what the test results showed with respect to the levels and types of narcotics detected, and why those results were scientifically significant when compared to the results on other parts of the vehicle, or for that matter, when compared to "the norm."11 Also, the parties' stipulation does not provide any

_____

11. Our review of the test results indicates that for each area of the vehicle that was vacuumed and subject to analysis, the test results were plotted on a separate graph. The two graphs that reported the testing on

22

indication that the test itself was administered properly so as to ensure reliability of the results. The only evidence we do have in the record are the actual test results plotted on graphs, A-28 to A-33, a report from the individual who administered the scan explaining the logistics of how he conducted the test, i.e., testing each item separately, A-81 to -82, and a cursory explanation in the Allegretto affidavit that the test "showed high levels of cocaine residue" on the currency. A-6. But the documents the government has provided in the record do not provide sufficient information to guide us in evaluating the evidentiary significance of the test results, even though it is the government that bears the initial burden of establishing that it had probable cause to initiate the forfeiture proceeding.

Thus, the government has left us to our own devices to decipher the meaning of the test results and evaluate their evidentiary significance in establishing probable cause to forfeit the currency. Given the circumstances, we simply cannot accept the government's conclusory statement that the test results show claimants' involvement in "significant drug activity." We conclude that the lack of credible information in the record concerning the ION Scan Analysis compels the conclusion that the results cannot be considered a factor weighing in the government's favor in the overall probable cause analysis. Cf., e.g. , Rivera, 979 F.2d at 264 (noting that officer's training and experience are factors to consider in determining probable cause, but observing that the "relevance [of such experience and training] in a particular case must be sufficiently conveyed so that . . . it can be understood by the average reasonably prudent person") (internal quotation marks omitted);

_____

the currency and the trunk are marked "ALARM," and there appears to be a higher level of cocaine indicated on each graph as compared to other substances indicated. However, we also note that on these graphs, the test recorded an increased (but less significant) presence of a substance marked "Cal," but we have no explanation as to what "Cal" represents. The government has given us little context in which to evaluate the test results; we simply do not know from the record what the peaks mean, how the test works, and why we should accord the results any evidentiary significance.

23

$67,220.00, 957 F.2d at 286 (stating that positive dog reaction was "weak evidence" in the probable cause equation because the government failed to establish reliability of the dog; court noted that it had to consider "the relative strengths and weaknesses of the evidence"); 2 Wayne R. LaFave, Search and Seizure S 3.2(c) (3d ed. 1996) (noting that "[u]nder the probable cause standard, it must `be possible to explain and justify [the seizure] to an objective third party,' and this is not accomplished by a general claim of expertise").

Finally, and perhaps most importantly, the government points to the large amount of cash, the manner in which the currency was transported, and claimants' prior convictions as the strongest evidence in its favor. It contends that the presence of a large sum of cash in a vehicle occupied by individuals previously convicted of drug offenses provides the requisite connection between claimants' currency and illegal drug activities.

While these factors admittedly might cause one to suspect that claimants may have been involved, or about to engage, in drug activities with this money, are they enough, when considered with the other suspicious circumstances, to give rise to the reasonable belief that such was the case? We think not. We recognize that the amount of money in claimants' possession and the method of packaging constitute probative circumstantial evidence that the currency itself is connected to illicit narcotics transactions. E.g., United States v. $149,442.43 in United States Currency, 965 F.2d 868, 877 (10th Cir. 1992); $67,220.00, 957 F.2d at 285. However, given the circumstances presented here, we do not view these factors as particularly probative of a narcotics nexus. For one thing, the amount of money in claimants' possession is consistent on its face with their statement that they intended to purchase a car, a factor that weighs in their favor in evaluating the totality of the circumstances. See $22,474.00, 246 F.3d at 1214 (affirming probable cause determination where, inter alia, claimant indicated that he was en route to purchasing two vehicles but the amount of money he possessed was insufficient to cover both transactions). Also, it is significant that claimants did not lie about the amount of

24

cash they possessed when Officer McManus questioned them, and they immediately claimed ownership of the money after they voluntarily consented to the search of their bags. Both of those considerations weigh in claimants' favor in the probable cause calculus. See, e.g. , $67,220.00, 957 F.2d at 286 (holding that government had probable cause to forfeit based upon fact that claimant twice understated amount of cash he was carrying); $215,300, 882 F.2d at 418-19 (finding probable cause to forfeit where, inter alia, claimant lied about amount of money he possessed, stating he had only $15,000, where search revealed additional $201,000 in his socks and apron); $83,310.78, 851 F.2d at 1235 (probable cause found where police found $125,410 in cash in claimant's home, individual attempted to hide cash, and everyone present consistently denied ownership of money); United States v. $40,000 in United States Currency, 999 F. Supp. 234, 237 (D.P.R. 1998) (finding that government failed to establish probable cause based upon, inter alia , the fact that claimant informed police officer of the quantity of cash that he was carrying and made no attempt to lie about the amount). Thus, while the possession of a large sum of money can, in some cases, be viewed as indicative of claimants' involvement in drug transactions, given the totality of circumstances concerning the currency, we do not find their possession of the cash at issue here as strongly suggestive of a narcotics nexus. In fact, on balance, this factor appears rather neutral.

As for the manner of packaging--rubber-banded in large bundles and concealed in baggage--the government has not presented evidence that this method of storage is unique to the drug trade.[12] See, e.g. , $30,060.00, 39 F.3d at 1044 (rejecting government's contention that drug dealers carry their money in wrapped bundles and that the amount of money was consistent with the cost of two kilograms of cocaine, stating that the government "provides no authority for these contentions which are, in any case, speculative"); see also $129,727.00, 129 F.3d at 491 (finding probable

_____

12. The government also points out that the money found in Johnson's bag was double-bagged in plastic, but there is no evidence in the record that narcotics-related currency is generally transported in this fashion.

25

cause to forfeit where government received informer's tip that led DEA to claimant, claimant fit drug courier profile, and carried $115,000 in cash; court stated that key factor was DEA agent's testimony that many drug couriers wrap drugs or drug money in fabric softener sheets and plastic wrap in an attempt to avoid detection of traces of narcotics by drug sniffing dogs). Moreover, we agree with the observation by the United States Court of Appeals for the First Circuit that "[t]here is little significance in the fact that [claimants' money] was concealed," as"[f]ew people carry money, especially large sums, in any way other than `concealed.' " $36,634, 103 F.3d at 1055 n.8. Thus, the government has failed to provide evidence in the record that would support the conclusion that the manner in which the currency was packaged weighs in the government's favor.

Finally, the government points to the prior convictions as supplying the requisite proof that claimants' currency could be linked to drug activity. We recognize, of course, that evidence of a prior drug conviction is probative of probable cause to forfeit currency in the claimant's possession under S 881(a)(6), e.g., $22,474.00, 246 F.3d at 1217; $83,310.78, 851 F.2d at 1236, just as a defendant's criminal record may be considered a probative factor in evaluating probable cause in the Fourth Amendment context, e.g., Conley, 4 F.3d at 1207; United States v. Frost, 999 F.2d 737, 744 (3d Cir. 1993). However, here, the prior convictions do not provide an adequate link between claimants' currency and illicit narcotics activities so as to establish probable cause for the forfeiture.

To be sure, claimants' prior convictions demonstrate that claimants could be linked to the narcotics trade in the past, and in that sense, their criminal record is probative because it might give rise to a reasonable suspicion or "hunch" that the currency in their possession was drug-related. But in our view, without additional credible evidence linking claimants, and thus, their currency, to drugs, claimants' prior convictions do not provide a sufficient temporal link to the drug trade to support the forfeiture of claimants' currency. This result is appropriate where, as here, claimants were not charged with narcotics violations based on the events that led to the forfeiture,

there is no credible evidence in the record that links claimants to any current drug activities,13 and the remaining evidence is not specific enough to the drug trade to provide the requisite connection or "hook" to narcotics. E.g., $5,000, 40 F.3d at 849-50 (finding that government lacked probable cause to forfeit currency, and discounting claimant's prior drug conviction, stating "the fact that [claimant] pleaded guilty to state drug charges more than six years earlier is of little import here: a man's debt to society cannot be of infinite duration").

In sum, we have considered the probative force of the credible evidence in its totality, and we cannot agree that the government has satisfied its burden of establishing that it had reasonable grounds to believe that the claimants had committed, or were about to commit, a predicate violation of the drug laws, and that the currency was "connected" to that drug activity. While some of the factors upon which the government relies arguably are suspicious and suggestive of involvement in some illicit activity, and might even support a "hunch" that the money somehow was connected to the drug trade, they do not rise to the level of establishing probable cause to institute forfeiture proceedings under S 881(a)(6). Rather, to establish probable cause in this context, the evidence must be sufficient to link the currency, via the claimants' actions, to the illegal drug trade in a manner that would support a reasonable belief that the money is, in essence, "drug money." See, e.g., $30,060.00, 39 F.3d at 1044 (finding that"suspicions of general criminality are not enough" and observing that there was no credible evidence connecting claimant's money to drugs; court noted that claimant " `could just as easily have been a distributor of street money in a political campaign, an embezzler, a jewel smuggler, an art thief, or an S&L crook as a drug conspirator' ") (quoting $191,910, 16 F.3d at 1072) (internal quotation marks omitted). Here, the credible evidence the government relies upon simply is too weak, both qualitatively and quantitatively, to support the District Court's determination that the money was, in

_____

13. See generally note 8, supra (listing cases in which government presented circumstantial evidence of recent connection to or involvement with drugs to establish probable cause to forfeit currency).

27

fact, drug-related. See Alabama v. White, 496 U.S. 325, 330 (1990) ("Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by the police and its degree of reliability. Both factors -- quantity and quality -- are considered in the`totality of the circumstances . . . .' "); $30,060.00, 39 F.3d at 1041 (relevant inquiry is whether credible evidence establishes the probability that money was "in fact" connected to drugs) (internal quotation marks omitted). In such circumstances, we agree with the following observation by the United States Court of Appeals for the Seventh Circuit:

> Nothing ties this money to any narcotics activities that the government knew about or charged, or to any crime that was occurring when the government attempted to seize the money. . . . We reiterate that the government may not seize money, even a half a million dollars, based on its bare assumption that most people do not have huge sums of money lying about, and if they do, they must be involved in narcotics trafficking or some other sinister activity. Moreover, the government may not require explanations for the existence of large quantities of money absent its ability to establish a valid narcotics nexus.

$506,231, 125 F.3d at 453-54 (emphasis added).

Under S 881(a)(6), the government must present sufficient facts to warrant a reasonable belief that the seized property was connected to illicit drug activities. We conclude that the government has failed to meet its burden in this case.

IV. CONCLUSION

For the foregoing reasons, we will REVERSE the District Court's Decree of Forfeiture entered on April 28, 2000, and will REMAND the matter with directions that the District Court enter judgment in favor of the claimants.

28

BRIGHT, Circuit Judge, concurring.

I write separately to add emphasis that, in this case, this court calls a halt to a government's attempt under the forfeiture statute to take someone else's money based on chimerical or flimsy evidence or even pretext. I wholeheartedly join in Judge Rendell's opinion.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit